The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
September 20, 2018

**2018COA137**

**No. 15CA1912, People v. Koper — Criminal Law — Jury Instructions — Defense of Person; Affirmative Defenses — Self-Defense; Prosecutorial Misconduct**

A division of the court of appeals considers whether the trial court erred in rejecting defense-tendered jury instructions on the affirmative defense of self-defense. The defendant asserted that he drew his weapon to defend himself against an ongoing assault by a third party. The People charged defendant with two counts of felony menacing, naming as victims bystanders against whom defendant admitted he did not act in self-defense. The division concludes that defendant was entitled to a self-defense instruction because his intent to defend himself against the third party could be transferred to the named victims. Because the erroneous denial

of the transferred intent self-defense instructions was not harmless, the division reverses the felony menacing convictions.

The division further concludes that prosecutorial misconduct requires reversal of defendant's prohibited possession of a weapon conviction.

The division also addresses, to the extent the issues are likely to arise on remand, the defendant's claims that the trial court erred in rejecting a jury instruction on the presumption and inferences a jury can draw based on blood alcohol content testing and in precluding an expert witness from giving testimony concerning the same.

Accordingly, the division reverses the judgment of conviction and remands for a new trial.

COLORADO COURT OF APPEALS                                    2018COA137

Court of Appeals No. 15CA1912
City and County of Denver District Court No. 14CR6405
Honorable Kenneth M. Laff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brian Michael Koper,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE CASEBOLT*
Bernard and Welling, JJ., concur

Announced September 20, 2018

Cynthia H. Coffman, Attorney General, Jillian J. Price, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1    Defendant, Brian Michael Koper, appeals the judgment of conviction entered on jury verdicts finding him guilty of two counts of felony menacing and one count of prohibited possession of a firearm while under the influence of intoxicating liquor.  He contends that the trial court failed to give a self-defense instruction, to which he was entitled, on the felony menacing counts and plainly erred in allowing the prosecutor to pose at least forty-four improper "were they lying" type questions during cross-examination.  He also contends that the court erred in rejecting his tendered instruction concerning the presumption and inferences that arise when a person's blood alcohol level is less than .05 and in precluding his expert witness from giving testimony concerning the same.  In an issue of first impression, we conclude that defendant was entitled to a self-defense instruction concerning the menacing charges based on the legal doctrine of transferred intent, and we further conclude that prosecutorial misconduct requires reversal of the prohibited possession of a firearm conviction.  We therefore reverse and remand for a new trial on all counts.

## I. Background

¶ 2       While at a bar one evening, defendant saw an acquaintance he knew only as "Abraham" or "Abram" along with several members of his family.  Defendant said something to Abram's sister that offended Abram.  Trying to make amends, defendant approached Abram on the bar's patio to offer him a beer.  Abram responded by punching defendant twice in the face.  Defendant then drew his firearm, for which he had a concealed carry permit, and aimed it at Abram.  After a short standoff, defendant handed the gun to his fiancee and the two left the bar.

¶ 3       The People charged defendant with two counts of felony menacing under section 18-3-206(1)(a), C.R.S. 2017 (proscribing the knowing placement of or attempt to place another person in fear of imminent serious bodily injury by employing any threat or physical action by the use of a deadly weapon).  The first count named the alleged victim as M.B., a security guard at the bar who had stepped between defendant and Abram after defendant drew his weapon.  The second count named the alleged victim as B.B., another bar patron who had been sitting on the patio at a picnic table behind Abram.  The People also charged defendant with

prohibited possession of a firearm under section 18-12-106(1)(d), C.R.S. 2017 (prohibiting "possession [of] a firearm while [a] person is under the influence of intoxicating liquor"). The jury found defendant guilty as charged.

## II. Self-Defense Instructions

¶ 4      Defendant contends that the trial court erred in rejecting his jury instructions on the affirmative defense of self-defense. We agree.

### A. Additional Facts

¶ 5      During trial, the defense tendered jury instructions defining the elements of "defense of person," explaining "apparent necessity," and raising the affirmative defense of self-defense as to the menacing charges. The People objected to the instructions, arguing that defendant had not acted in self-defense as to the named victims but rather in response to Abram's actions, and no offense concerning Abram had been charged. In response, the defense argued that, though defendant "certainly . . . wasn't defending himself against [M.B.] or [B.B.] . . . he pulled the weapon in defense of an assault that had actually occurred, and in his opinion, was ongoing. The jury needs to know in some way, shape, or fashion, in

3

these instructions, that he is entitled to defend himself against an assault."

¶ 6　The trial court rejected the affirmative defense instructions. However, it allowed the defense to incorporate a self-defense argument in a theory of the case instruction that read, in relevant part, that defendant "drew his firearm and used it solely for the purposes of preventing further assault [by Abram] and holding his assailant at bay." In permitting that instruction, the trial court stated, "[T]here was an element of self-defense in the case; it was not as to the people who were allegedly menaced."

¶ 7　During closing argument, the prosecutor argued that "nowhere in the jury instructions does the word or concept 'self-defense' show up." He also stated that when a person points a gun at another, whether it is in self-defense is "immaterial" because the action inevitably scares the person at whom the gun is pointed.

## B.　Standard of Review

¶ 8　If there is some credible evidence presented that a defendant has acted in self-defense, "the prosecution bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, and the trial court must instruct the jury

4

accordingly." *People v. Pickering*, 276 P.3d 553, 556 (Colo. 2011). "The question of whether the defendant has presented 'some credible evidence' to support each element of an affirmative defense is a question of law," and we therefore review the issue de novo. *People v. Oslund*, 2012 COA 62, ¶ 16.

¶ 9    We review preserved instructional errors for nonconstitutional harmless error. *See Castillo v. People*, 2018 CO 62, ¶¶ 55-61 (reviewing erroneous initial aggressor instruction for harmless error); *People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001). Under that standard, we reverse only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." *Hagos v. People*, 2012 CO 63, ¶ 12 (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo. 1986)).

### C. Applicable Law

#### 1. Self-Defense

¶ 10    Colorado recognizes a limited statutory right to use physical force in self-defense. *See generally* § 18-1-704, C.R.S. 2017. In particular, a person may use physical force on another person to defend himself from what "he reasonably believes to be the use or imminent use of unlawful physical force by that other person."

5

§ 18-1-704(1).  Additionally, a person acting in self-defense may employ "a degree of force which he reasonably believes to be necessary" to defend himself.  *Id.*

## 2. Transferred Intent

¶ 11    The doctrine of transferred intent "is a legal fiction that is used to hold a defendant criminally liable to the full extent of his or her criminal culpability."  *People v. Hunt*, 2016 COA 93, ¶ 24 (quoting *State v. Fekete*, 901 P.2d 708, 714 (N.M. 1995)).  The doctrine is typically invoked when an actor intends to commit a criminal act, but "the actual result differs from the result designed or contemplated only in that a different person or property was injured or affected."  *Id.* (quoting *Fekete*, 901 P.2d at 714).  By way of example, if A intends to shoot B, but misses and instead shoots and kills unintended victim C, A can be held criminally liable for C's murder even though A did not intend to harm C.  In that scenario, A's criminal intent to harm B "transfers" to C.  *See People v. Jackson*, 2018 COA 79, ¶ 89 (discussing transferred intent in the context of determining whether attempted murder after deliberation of one person is a lesser included offense of the murder after deliberation of another person).

¶ 12 Thus, the doctrine of transferred intent is most frequently used as a "sword" by the prosecution to hold a defendant criminally liable. Nevertheless, the doctrine can also limit a defendant's liability:

> There are, of course, some situations where, though *A* intentionally kills or injures *B*, *A* is not guilty of murder or battery. Though he kills *B*, . . . he may be guilty of no crime at all (e.g., when he is privileged to kill or injure *B* in self-defense, or to prevent *B*'s commission of a felony). Now suppose *A* shoots at *B* under these circumstances but, missing *B*, hits and kills or injures *C*, an innocent bystander. If *A* aims at his attacker *B* in proper self-defense, but hits *C* instead, he is not generally guilty of murder or battery of *C*. Once again, he is only as guilty as to *C* as he would have been had his aim been accurate enough to have hit *B*.

1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4(d) (3d ed. 2017) (footnote omitted).

¶ 13 Accordingly, several jurisdictions have embraced the concept of "transferred intent self-defense." Under that concept, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." *People v. Mathews*, 154 Cal. Rptr. 628, 631-32 (Cal. Ct. App. 1979); *see State v. Clifton*,

290 N.E.2d 921, 923 (Ohio Ct. App. 1972); *Holloman v. State*, 51 P.3d 214, 221-22 (Wyo. 2002) (collecting cases); *see also State v. Bellinger*, 278 P.3d 975, 989-91 (Kan. Ct. App. 2012) (Atcheson, J., dissenting). Colorado's appellate courts have not addressed this precise issue. *But see Henwood v. People*, 54 Colo. 188, 194, 129 P. 1010, 1013 (1913) (approving in dicta self-defense instruction when defendant unintentionally shot and killed a bystander while acting to defend himself from a third person).

## D. Analysis

¶ 14    It is essentially undisputed that defendant raised some credible evidence that he acted in self-defense against Abram. Defendant testified that after Abram punched him twice in rapid succession, he stumbled backward and took a knee before drawing his weapon. Abram was pacing back and forth in front of him and threatening to continue the fight. Defendant testified that he believed Abram "was going to beat [him] to a bloody pulp" if he did not use the firearm to keep Abram at bay. In our view, that evidence would have been sufficient to raise an affirmative defense of self-defense if Abram had been named as a victim. *See People v. Speer*, 255 P.3d 1115, 1119 (Colo. 2011) ("It is too well settled to

8

merit further discussion that a trial court is obliged to instruct the jury on a requested affirmative defense if there is any credible evidence, including even highly improbable testimony of the defendant himself, supporting it.").

¶ 15     The crux of the issue here, however, is whether defendant was entitled to raise self-defense as an affirmative defense as to M.B. and B.B.  As the *Mathews* court reasoned:

> [T]he common law theory of "transferred intent" . . . , in its principal application, establishes that one's criminal intent follows the corresponding criminal act to its unintended consequences.  As the noted cases have held, the reasoning applies equally to carry the [l]ack of criminal intent to the unintended consequences and thus preclude criminal responsibility.

154 Cal. Rptr. at 631.  We find that reasoning persuasive and therefore elect to follow the jurisdictions that have adopted and applied the concept of "transferred intent self-defense."

¶ 16     Under the facts of the present case, we conclude that defendant was entitled to raise the affirmative defense as to both victims.

¶ 17     On the menacing charge alleging B.B. as the victim, B.B. testified that she heard glass break, turned, and saw defendant

with "a bunch of guys around him, and they were all kind of fighting." When asked if the gun was ever pointed at her, she responded that "[i]t was pointed in [her] direction." During cross-examination, B.B. testified that Abram was between her and defendant during the period when defendant's gun was drawn.

¶ 18    Thus, to the extent that defendant "knowingly place[d] or attempt[ed] to place [B.B.] in fear of imminent serious bodily injury" as is required by the statute defining felony menacing, § 18-3-206(1), his actions may have been justified self-defense. The evidence adduced at trial indicated that B.B. was a bystander incidentally affected by defendant's asserted attempt to defend himself against what he perceived as a threat posed by Abram. Thus, defendant was entitled to assert that his intent to defend himself against Abram transferred to B.B.

¶ 19    Concerning M.B., that victim testified, "[Defendant] had the gun pointed at the patron [Abram], at the other guy. As I went to approach him, he went from pointing the pistol at him to pointing it at me." M.B. stated that he approached defendant from the front at "a 45-degree-ish angle" from the right, and that defendant pointed the gun in his face.

10

¶ 20    M.B.'s testimony by itself would not allow defendant's conduct as to him to be justified by self-defense.  According to this testimony, defendant pulled his weapon away from the initial aggressor — Abram — and trained it on M.B., even pointing it at his face.  And no evidence adduced at trial indicated that defendant believed M.B. may have been a confederate of Abram's such that defendant believed M.B. presented a threat.

¶ 21    However, defendant testified that M.B. approached him from the "back of [his] right hand," put two hands on defendant's two-handed grip of his pistol, and squeezed defendant's hands together.  M.B. then stepped forward and "came into [defendant's] chest."  Defendant testified he perceived that there were a number of people around him who were trying to disarm him, including M.B., but he was trying not to be disarmed because he was "getting [his] butt kicked by Abram."  Then, according to defendant, he was able to avoid being disarmed by pointing the gun upward and saying, "[B]e careful, man, this thing is loaded," whereupon the crowd backed away from him.  Defendant testified that he did not point the gun at M.B., and he denied waving the gun around at other patrons on the patio.

¶ 22     This testimony presents a contrary version of the events surrounding M.B.'s interaction with defendant.  If believed by the jury, defendant's testimony constitutes sufficient evidence to justify a self-defense instruction as to victim M.B.  Defendant's intent to defend himself against Abram would, if the jury believed this testimony, allow the intent as to Abram to transfer to the encounter with M.B.

¶ 23     Thus, we conclude the trial court erred in rejecting defendant's jury instructions on self-defense as an affirmative defense to the menacing charges.  We further conclude that the error was not harmless because while the defense's theory of the case instruction referred generally to self-defense, the instruction did not require the prosecution to disprove self-defense beyond a reasonable doubt. *See Pickering*, 276 P.3d at 556.  The instructions on the menacing charges provided no means by which the jury could acquit defendant if it found that, though he committed felony menacing, he was justified in acting to defend himself.  Because we conclude that the erroneous denial of the self-defense instructions "substantially influenced the verdict," *Hagos*, ¶ 12, we reverse the convictions for felony menacing.

¶ 24    We emphasize that we express no opinion as to whether defendant used reasonable physical force or whether his conduct as to either victim was in fact justified.  Our conclusion merely leaves it to the jury to decide whether defendant's actions were justified under appropriate jury instructions.  *See* § 18-1-704(1) (a person must reasonably fear the use or imminent use of unlawful physical force by another person and use reasonable force in response); *cf. Holloman*, 51 P.3d at 222 ("Under these alleged facts, we nevertheless believe that [defendant's] testimony required that the jury be instructed on the law of self-defense.  The jury's role is to determine whether [his] intentional acts were self-defense . . . .").

¶ 25    The People do not directly address defendant's transferred intent argument.  Instead, they assert in their brief that (1) defendant was not entitled to any affirmative defense because he did not admit that he committed the charged acts and (2) there was no credible evidence that either alleged victim used unlawful force against defendant.

¶ 26    As to the first contention, we disagree that defendant is barred from raising any affirmative defense as to either menacing victim.  Although he did not concede guilt, he admitted that he committed

the acts that gave rise to those charges. *See People v. Whatley*, 10 P.3d 668, 670 (Colo. App. 2000) ("An affirmative defense is a defense that *admits conduct leading to the act charged* but seeks to justify, excuse, or mitigate that conduct.") (emphasis added). As to the second argument, we disagree for the reasons expressed in our analysis above.

¶ 27 The People asserted during oral argument that transferred intent self-defense is only available under a first degree murder after deliberation or assault charge, given the statutes' allowance of a charge even when the intended victim is not harmed, but a third person's death or assault is caused by the actor. *See, e.g.*, § 18-3-102(1)(a), C.R.S. 2017; § 18-3-202(1)(a)-(c), C.R.S. 2017. Because this contention was raised for the first time at oral argument, we decline to address it here. *See People v. Becker*, 2014 COA 36, ¶ 23 (court will not address an argument first raised by the People during oral argument).

¶ 28 Thus, we conclude that on remand defendant is entitled to raise the affirmative defense of self-defense as to the menacing charges, if the evidence at trial on remand is presented in a similar

posture as that presented on this appeal, and the trial court must give appropriate instructions concerning it.

### III.  Prosecutorial Misconduct

¶ 29    Defendant contends that prosecutorial misconduct requires reversal of his conviction for possession of a firearm while intoxicated.  Reviewing under a plain error standard because defendant did not object to the questions, we agree.

### A.  Standard of Review

¶ 30    We engage in a two-step analysis in reviewing claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances.  *Id.* Second, we decide whether, under the proper standard of review, any misconduct warrants reversal.  *Id.*  We review conduct to which a defendant did not object for plain error.  *Id.* at 1097.

### B.  Applicable Law

¶ 31    "[A]sking a witness to opine on the veracity of another witness is prejudicial, argumentative, and ultimately invades the province of the fact-finder."  *Liggett v. People*, 135 P.3d 725, 732 (Colo. 2006).  Thus, "were they lying" type questions are "categorically improper."

*Id.* at 733; *see also People v. Wittrein*, 221 P.3d 1076, 1081 (Colo. 2009) ("In Colorado, neither lay nor expert witnesses may give opinion testimony that another witness was telling the truth on a specific occasion." (citing CRE 608(a))).

¶ 32    Improper "were they lying" type questions include asking a testifying defendant whether another witness was "mistaken," *State v. Flanagan*, 801 P.2d 675, 679 (N.M. Ct. App. 1990) (noted as support for a finding of error in *Liggett*), as well as questions asking a defendant to explain the testimony of an adverse witness, *Burgess v. State*, 495 S.E.2d 445, 447 (S.C. 1998) (also noted as support in *Liggett*).

### C. Application

¶ 33    We have little difficulty in concluding that the prosecutor's questions here were improper "were they lying" questions.

¶ 34    Defendant testified in his own defense. As noted earlier, during direct examination, defense counsel summarized M.B.'s testimony that defendant had aimed his weapon directly at M.B. and asked defendant, "Is that what happened?" Defendant responded, "No." Later, defense counsel also asked whether defendant believed he had been "substantially incapable of

16

exercising sufficient physical control" when he drew his weapon, to which defendant responded, "Absolutely not, and I think the testimony of everybody proves that."

¶ 35    During cross-examination, the prosecutor repeatedly asked defendant to opine on testimony given by prosecution witnesses. The prosecutor asked defendant about inconsistencies between his testimony and that of the People's witnesses, asking whether the People's witnesses were "wrong," "right or wrong," "completely incorrect," and "completely wrong," and also asking at various points whether testimony from the People's witnesses had been "no good" and "true or untrue."

¶ 36    In particular, the prosecutor asked defendant whether other witnesses incorrectly testified that he had "waved" the gun around and that he had been drunk.  He also asked whether defendant believed the People's witnesses were wrong about various details, including what time he had arrived at the bar, how he had reacted to Abram's punches, and whether he had had his jacket over his arm when he approached Abram.

¶ 37    The People assert that the prosecutor's questions were proper under *Liggett* because they were merely designed to highlight

17

conflicting evidence and "did not call for defendant to opine as to whether the witnesses were lying."  The record belies this argument.  The prosecutor asked defendant point blank whether the People's witnesses were lying, incorrect, and wrong.  *Cf. Liggett,* 135 P.3d at 735 (considering questions about whether witness was "mistaken" to fall within prohibited category).

¶ 38    The People acknowledge on appeal that

> [t]here are other ways to emphasize conflicts in the evidence and raise questions as to a witness's credibility that do not involve asking "were they lying" types of questions.  For example, a cross-examiner may ask non-prejudicial questions that highlight the discrepancies and later emphasize any conflicting accounts by juxtaposing them in closing argument.

*Id.* at 732.  But contrary to the People's further argument, the prosecutor here went beyond asking non-prejudicial questions designed to highlight discrepancies in the evidence.  Instead, by our count, the prosecutor asked defendant some forty-four times whether another witness's testimony was incorrect, wrong, or untrue, or whether the witness had lied.  These questions fell squarely within the category of prohibited "were they lying" questions.

¶ 39    The People also contend that the defense opened the door to any impermissible questions.  At the outset, it is not clear that the "opening the door" concept applies in this context.  In *Liggett*, a division of the court of appeals concluded that "were they lying" questions were generally disallowed, "except when the only possible explanation for the inconsistent testimony is deceit or lying or when the defendant has opened the door by testifying about the veracity of other witnesses on direct examination." *People v. Liggett*, 114 P.3d 85, 88 (Colo. App. 2005), *aff'd*, 135 P.3d 725.  While the supreme court affirmed the division's outcome, it disagreed with the division's holding that there were exceptions to the categorical prohibition on "were they lying" questions, stating: "[W]e decline to adopt the rule articulated by the court of appeals.  Instead, we adopt the approach followed in a majority of jurisdictions that broadly prohibits asking a witness to comment on the veracity of another witness."  135 P.3d at 727.  *But see People v. Kessler*, 2018 COA 60, ¶¶ 43-44 (appearing to apply the opening the door exception generally but finding it inappropriate under the facts).

¶ 40    In any event, we do not agree that the defense opened the door to the barrage of "were they lying" questions the prosecutor

19

employed here. Although defendant testified that he did not agree with M.B.'s version of events and that he believed other witnesses' testimony supported his assertion that he had not been under the influence, he did not directly comment on the truth or veracity of any witness who had given testimony during direct examination.

¶ 41    Thus, we conclude that the prosecutor's "were they lying" questions were improper.

## D.  Plain Error Review

¶ 42    We turn to whether the prosecutor's misconduct requires reversal under the plain error standard. We conclude that it does.

¶ 43    An error is plain only if it is "obvious and substantial." *Hagos*, ¶ 14.  For an error to be obvious, it must ordinarily "contravene (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law." *Scott v. People*, 2017 CO 16, ¶ 16 (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40).  Put another way, an error is obvious if it is so clear-cut that a trial court should be able to avoid it without the benefit of objection. *People v. Ujaama*, 2012 COA 36, ¶ 42. An error is substantial if it "undermined the fundamental fairness of the trial itself so as to cast serious doubt

on the reliability of the judgment of conviction." *Hagos*, ¶ 14

(quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

¶ 44    Here, we conclude that the error was obvious because it violated controlling Colorado case law — namely, the Colorado Supreme Court's holding in *Liggett*. *See also Kessler*, ¶ 46 (describing rule "that witnesses should not be asked to comment on the veracity of other witnesses" as a "well-settled legal principle"). The rule set forth in *Liggett* is categorical and, in our view, one a trial court should apply even absent an objection, at least in circumstances, such as those here, where the prosecutor repeatedly and pervasively poses improper questions. Indeed, the trial court in this case acknowledged the impropriety of asking defendant whether other witnesses had lied. After redirect examination, a juror submitted a question for defendant asking in part, "Are you saying that all the witnesses who said you were drunk and waving a gun were lying?" The trial court sustained the defense's speculation objection, stating, "It's also not appropriate for one witness to comment upon the credibility of others."

¶ 45    The error was substantial. Almost the entirety of the prosecutor's cross-examination of defendant consisted of

impermissible questions. The People contend that defendant's testimony on cross-examination bolstered his version of events, and thus the error was not prejudicial. However, that argument gives short shrift to the untenable position defendant was in during the cross-examination: asking the defendant to opine on the veracity of the People's witnesses places him "in a no-win situation. If the defendant says the other witness *is* lying, then the defendant is put in the position of calling someone a liar . . . . If the defendant says a contradictory witness is *not* lying, then a fair inference is that the *defendant* is lying." *Liggett*, 135 P.3d at 732 (quoting *State v. Graves*, 668 N.W.2d 860, 872 (Iowa 2003)); *see also id.* at 733 (noting that the defendant's responses "d[id] not excuse the impropriety of the questioning").

¶ 46 The questions here were not limited to a particular or peripheral issue. Instead, the prosecutor asked defendant to opine on nearly every witness's testimony about every contested issue in the case. *Cf. id.* at 735 (noting that questions about whether witness was "mistaken" were not plainly erroneous where "the subject matter of the questions was largely peripheral to issues before the court" and the trial court did not refer to remarks in its

findings). Most significantly, the improper questions concerned both defendant's level of intoxication and whether he had "waved" the gun or had kept it trained on Abram. These issues were central to the prosecution's case on the possession of a firearm charge.

¶ 47 Furthermore, the proffered jury question that the trial court declined to ask concerning the contrast between defendant's testimony and that of the prosecution's witnesses shows that at least one member of the jury readily connected the prosecutor's questioning on cross-examination to a potential assertion that either defendant or the prosecution witnesses were "lying."

¶ 48 In sum, we conclude that the error undermines our confidence in the reliability of the judgment of conviction.

¶ 49 We acknowledge that reversal is warranted under plain error review only when prosecutorial misconduct is "flagrantly, glaringly, or tremendously improper." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)). In our view, this is the rare case in which the misconduct rose to that level.

¶ 50 Accordingly, we conclude that the prosecutor's misconduct requires reversal of defendant's prohibited possession of a firearm conviction.

IV. Presumption Instruction and Expert Testimony

¶ 51 Defendant also contends that the trial court erred in (1) rejecting his proposed jury instruction on the presumption and inferences a jury can draw based on blood alcohol content (BAC) and (2) precluding an expert witness from testifying on the same topic. We briefly address this contention to provide guidance on remand.

¶ 52 Defendant submitted a jury instruction tracking the presumption and permissible inferences set out in section 42-4-1301(6)(a), C.R.S. 2017 — namely, that a BAC of .05 or less entitles the defendant to a presumption that he or she was not driving under the influence of alcohol, a BAC above .05 but below .08 gives rise to a permissible inference that the defendant's driving was impaired by the consumption of alcohol, and a BAC above .08 gives rise to a permissible inference that the defendant was driving under the influence of alcohol. The tendered instruction stated that the jury could draw an inference or presumption based on defendant's

24

BAC as "shown by analysis of the defendant's blood or breath."

However, there was no evidence that police officers had tested

defendant's blood or breath at any time in connection with this

case. Because of the lack of blood or breath analysis, the trial court

rejected the instruction. Instead, it allowed a defense-tendered

instruction defining "under the influence."

¶ 53 Defendant called a toxicologist as an expert witness. Based on

information provided by the defense detailing the food and drinks

defendant had consumed at the bar, as well as his height and

weight, the expert testified that defendant's BAC at the time he

drew his weapon was below .05. However, the trial court ruled that

the expert could not tie her conclusion about defendant's BAC to

the presumption in section 42-4-1301(6)(a). The trial court also

ruled that the expert could not testify on how a BAC of .05 or below

would affect a person's body and mental functioning because that

information had not been disclosed in the expert's report. *See*

Crim. P. 16(II)(b).

¶ 54 First, we conclude that the trial court did not err in rejecting

the defense-tendered instruction on the BAC-related permissible

inferences and presumption. As the trial court reasoned, the

25

presumption and inferences are set forth in the statute prohibiting driving while impaired and driving under the influence. *See generally* § 42-4-1301. The presumption and inferences are not incorporated in the prohibited possession of a firearm statute; section 18-12-106(1)(d) does not define "under the influence" at all, much less in terms related to a person's BAC.

¶ 55    More significantly, the language of section 42-4-1301(6) implies that a BAC calculation must be based on analysis of the defendant's blood or breath. Such analysis was not done in this case. For the same reason, we conclude the trial court did not err in ruling that the defense's expert witness could not tie her conclusions about defendant's BAC to the inferences and presumption in the driving while impaired and driving under the influence statute.

¶ 56    To the extent defendant contends the trial court erred in concluding that the expert could not testify on the physical effects of a BAC of .05 or lower, because that issue was not addressed in her report, we decline to address the contention. That issue is unlikely to arise on remand.

¶ 57     We take no position on whether the People opened the door to evidence or an instruction tying defendant's BAC to section 42-4-1301(6), by eliciting testimony from police officers that they considered defendant too intoxicated to drive when he was arrested. Because it is not clear that the issue will arise on remand, we decline to address it. *See People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004) (declining to address evidentiary issue unlikely to arise "in the same context" on retrial), *aff'd*, 119 P.3d 1073 (Colo. 2005).

## V.  Cumulative Error

¶ 58     In light of our determination that defendant's convictions must be reversed, we need not address his argument regarding cumulative error.

## VI.  Conclusion

¶ 59     The judgment is reversed, and the case is remanded for a new trial on all charges.

JUDGE BERNARD and JUDGE WELLING concur.