23CA0643 Peo v Smith 04-02-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA0643
Weld County District Court No. 21CR1469
Honorable Allison J. Esser, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Keith Alan Smith,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division III
Opinion by JUDGE BERNARD*
Moultrie, J., concurs
Taubman*, J., specially concurs

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jason C. Middleton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1    A jury convicted defendant, Keith Alan Smith, of possession with intent to manufacture or distribute methamphetamine and adjudicated him a habitual traffic offender.  He appeals.  We affirm.

## I.    Background

¶ 2    In July 2021, an investigator working with the Weld County Drug Task Force saw defendant leave a business and get into a stolen car.  At the investigator's request, a police officer patrolling nearby stopped the car.

¶ 3    When the officer asked defendant for identification, defendant admitted his driving privileges were suspended.  While talking with defendant, the officer noticed a black bag on the driver's seat floorboard near defendant's right foot.  The officer learned defendant's driver's license was revoked, so he arrested him.

¶ 4    The officer asked a second officer to inventory the contents of the stolen car before towing it.  During the inventory search, the second officer found two bags containing methamphetamine in the black bag, along with a pipe and a digital scale.  Elsewhere in the car, he found two smaller bags of methamphetamine, a second pipe, a calculator, some gel capsules, and two phones.

¶ 5    At the police station, the investigator interviewed defendant and asked him to become a confidential informant.  Defendant declined the invitation.

¶ 6    At trial, defendant's theory of defense was the methamphetamine was not his; rather, the police officers planted it in the car.  Defense counsel supported this theory by arguing, "[T]he discrepancies between the testimony of law enforcement and what is shown on their body worn camera footage calls into question their credibility and motive."

## II.    Defense Jury Instruction

¶ 7    Defendant contends the court erred when it refused his jury instruction addressing the statutory permissive inference of police officer misconduct in section 24-31-902(1)(a)(III), C.R.S. 2025, a provision of the Enhance Law Enforcement Integrity Act.  (Although the Act has been amended since the time of the crime, because the changes did not substantively impact the portions relevant on appeal, we cite the current version.)

### A.    Additional Background

¶ 8    Both officers testified at trial about their use of their body-worn cameras during their contact with defendant.

¶ 9    The footage from the first officer's camera showed the lens was covered by something for a few minutes during his initial contact with defendant. The first officer could not explain in his trial testimony what had covered the camera lens.

¶ 10    The second officer turned off his camera for twelve minutes at one point. He admitted to doing so at trial, adding that he only turned it back on after he picked up the black bag and looked inside it.

¶ 11    Both officers testified they confiscated $1,600 in cash from defendant during the arrest. But their cameras were turned off when they counted the cash, which violated the police department's policy.

¶ 12    After all the evidence had been presented, defense counsel asked the court to instruct the jury: "If you conclude that law enforcement intentionally tampered with or disabled their body-worn cameras, then there is a permissive inference that the missing footage would have reflected misconduct by the peace officer." The court denied this request because it thought the instruction was "argumentative." The court added: "Certainly, the [d]efense can argue . . . whether or not law enforcement intentionally tampered

3

with or disabled their body-worn cameras and what inference or conclusion the jury should reach from that."

    B.  The Enhance Law Enforcement Integrity Act

¶ 13  The Enhance Law Enforcement Integrity Act governs all local law enforcement agencies' use of body-worn cameras. *See* § 24-31-902; *People v. Soron*, 2026 CO 3, ¶ 41. The Act states officers "shall wear and activate a body-worn camera . . . during any interaction with the public initiated by the peace officer, whether consensual or nonconsensual, for the purpose of enforcing the law or investigating possible violations of the law." § 24-31-902(1)(a)(II)(A). The Act describes when an officer "may" turn off a body-worn camera: "to avoid recording personal information that is not case related; when working on an unrelated assignment; when there is a long break in the incident; and in administrative, tactical, and management discussions when civilians are not present." § 24-31-902(1)(a)(II)(B). It also explains the consequences when a police officer does not comply with the Act. *See* § 24-31-902(1)(a)(III)-(IV). For example, if a police officer does not activate a camera or tampers with it, then "there is a permissive inference in any investigation or legal

proceeding . . . that the missing footage would have reflected misconduct by the [police] officer." § 24-31-902(1)(a)(III).

### C. Standard of Review

¶ 14     In his reply brief, defendant submits the court's decision to deny his request for the instruction "amounts to constitutional error." This is not the standard of review. "We review preserved instructional errors for nonconstitutional harmless error." *People v. Koper*, 2018 COA 137, ¶ 9. Under this standard, if a court erroneously declines to give a defense instruction, we will reverse a conviction only if "there is a reasonable probability that [the error] contributed to the defendant's conviction." *Mata-Medina v. People*, 71 P.3d 973, 980 (Colo. 2003).

### D. Analysis

¶ 15     We will assume, without deciding, the court erred when it denied defense counsel's proposed instruction. But we nonetheless conclude this putative error was harmless because there is not a reasonable probability the error contributed to defendant's conviction. *See id.*

¶ 16     A permissive inference "allows, but does not require, the trier of fact to infer" something. *Jolly v. People*, 742 P.2d 891, 896 (Colo.

1987).  Often, the *something* is an "elemental fact of a crime from proof by the prosecution of the predicate fact on which the inference is based."  *Id.*

¶ 17     In the context of this case, as we understand defendant's contention, the permissive inference does not arise from the prosecution's proof of a predicate fact concerning an element of the crime charged.  Rather, under section 24-31-902(1)(a)(III), the permissive inference contained in defendant's proposed instruction would have worked this way: Had the first officer not covered the lens of his camera; had the second officer kept his camera on; and had the two officers kept their cameras on when they counted the $1,600, the resulting footage would have shown they planted methamphetamine in the car defendant was driving.  So, defendant submits, the jury should have been instructed that it was allowed, but not required, *see Jolly*, 742 P.2d at 896, to infer the officers planted the methamphetamine.

¶ 18     But, based on the evidence submitted at trial, two other instructions the court read to the jury, and defense counsel's closing argument, the jury clearly knew it was allowed, but not required, to infer the officers planted the methamphetamine.

6

¶ 19    The jury saw the recordings from the two officers' cameras and observed the first officer's camera lens becoming covered.  Through defense counsel's questions, it learned that the second officer's camera was not activated during part of the arrest and that neither officer's camera was activated, in violation of departmental policy, when they were counting the $1,600.  These issues were explored on cross-examination, and they were front and center at trial.

¶ 20    The court instructed the jurors they were "the sole judges of the credibility of each witness and the weight to be given to the witness's testimony."

¶ 21    The jury was also given defendant's theory of defense instruction.  It read:

> The defense asserts that [defendant] did not possess the drugs charged in this case.  The defense asserts that law enforcement planted the evidence in this case.  The defense asserts that the discrepancies between the testimony of law enforcement and what is shown on their body worn camera footage calls into question their credibility and motive.

¶ 22    This instruction's focus was on alleged police misconduct, and defense counsel began his closing argument by giving the jury a reason for the misconduct: the "[w]ar on drugs."  He said this war

7

could have a "dark side" where "people think that . . . the ends justify the means," and he pointed to inappropriate means such as planting evidence or lying. Defendant, he continued, became a "casualty" of the "war . . . [the] officers [in this case] were fighting."

¶ 23 When the officers found the money on defendant, defense counsel said they decided he was a drug dealer, even though he was not one. Because he must be a drug dealer, counsel went on, the officers wanted information from him; because they wanted information from him, they needed leverage on him; and, once they had leverage, they could coerce him to become a confidential informant. The way to gain the necessary leverage to achieve their goal, defense counsel submitted, was by covering lenses, turning off cameras, and planting methamphetamine in the car defendant was driving. The officers' failure to record the counting of the $1,600 served to corroborate this theory.

¶ 24 But, counsel argued, since defendant was not a drug dealer, the officers' misconduct came to naught. Defendant had no information about drug dealing to give the officers, so he declined to become a confidential informant.

¶ 25    Defense counsel discussed this theory in detail during closing argument; indeed, it was the sole focus of his argument.  Over approximately twenty-three pages of transcript, counsel repeatedly accused the officers of planting the methamphetamine, covering the lens of the first officer's camera, turning off the second officer's camera, and violating departmental policy by failing to record their count of the $1,600.

### III.    Prosecutorial Misconduct

¶ 26    Defendant contends the prosecutor committed misconduct, rising to the level of reversible error, during both his closing arguments because he denigrated both the theory of defense and defense counsel.  We disagree.

### A.    Additional Background

¶ 27    Defendant challenges the following statements the prosecutor made during his closing arguments.

¶ 28    During his initial closing argument, the prosecutor said:

- "So, [the officers] could frame a guy they'd never met before and put their entire [careers] in [peril.]  Logic, there's no logic there.  It's insanity."

- "But as you're listening to [d]efense [c]ounsel, ask yourself as he gets you in the weeds, cause he's gonna do that. Is anything he says [logical]?"

¶ 29 During his rebuttal closing argument, the prosecutor said:

- "Just checking to make sure there's not credits rolling behind me. Because that would have made great fiction what you just heard."

- "The reality is — is what [d]efense counsel just presented to you is bad Hollywood drama."

- "Fiction with a plot line that doesn't work, that doesn't accord to . . . reason, doesn't accord to common sense, doesn't accord to logic."

- "He's talking about this outrageous claim of planting evidence."

- "Three officers with nothing to gain at all and you're gonna make an outrageous claim like that about three public servants?"

¶ 30 Defendant did not object to any of these statements.

¶ 31 He objected, however, when the prosecutor said a short time later, "Let's not [mince] words. If you're gonna make outrageous

10

claims, let's be perfectly clear. This is one of the most outrageous claims I have heard in [the] many years I've been working as a district attorney." The court sustained the objection and instructed the jury to disregard the prosecutor's statement.

¶ 32    The prosecutor then said:

> It's an outrageous claim. I guess I don't need to explain how outrageous it is. You have common sense. You can tell. If you're gonna make an outrageous claim about three public servants there better be something on the record that is not vague. That is not speculative, which is the very nature of everything that just came out of [d]efense counsel's mouth.
>
> There better be something that is not purely imaginary, that is not really the produc[t] of [a] Netflix series of crime shows on Prime Video or whatever. There better be something rooted in reality to support that kind of outrageous claim. And there isn't.

The prosecutor also described the theory of defense as "[t]hat outrageous theory that three public servants [with] literally nothing to gain, no motive, unless you're a crazy person[,] . . . have it out for a guy they've never met and are gonna frame him."

¶ 33    Defendant did not object to these latter statements.

11

¶ 34    On appeal, defendant contends the prosecutor "repeatedly denigrated defense counsel and his arguments." The prosecutor, defendant continues, "impl[ied] [the] defense [was] being presented in bad faith, which [was] exactly what the prosecution did when it referred to defense counsel's arguments as, among other things, 'insanity,' 'fiction,' 'bad Hollywood drama,' and 'outrageous.'"

## B.    Legal Principles

¶ 35    In reviewing a claim a prosecutor committed misconduct during closing argument, we engage in a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). First, we must decide whether the statements were improper. *Id.* Second, if the prosecutor made an improper statement, we must then decide whether we will reverse the defendant's conviction, applying the appropriate standard of review. *See id.* Since defendant did not object at trial to the statements he challenges on appeal, the appropriate standard of reversal is whether any improper statements constituted plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 36    A prosecutor, "while free to strike hard blows, is not at liberty to strike foul ones." *People v. Yachik*, 2020 COA 100, ¶ 58 (quoting

*Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005)).  Foul blows include statements during closing argument calculated to inflame the jury's passions, to denigrate defense counsel, to misstate the evidence, or to express personal opinions about the credibility of witnesses.  *People v. Vasquez*, 2022 COA 100, ¶ 62. "References to a defendant's or defense counsel's diversionary tactics . . . are improper when used as a means to denigrate the defendant or defense counsel . . . ."  *People v. Serra*, 2015 COA 130, ¶ 89.

¶ 37     But "prosecutors have wide latitude in the language and style they choose to employ."  *People v. Duncan*, 2023 COA 122, ¶ 31 (quoting *People v. McMinn*, 2013 COA 94, ¶ 60).  "[B]ecause arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *People v. Samson*, 2012 COA 167, ¶ 30.  To decide whether a prosecutor's comments during closing argument were misconduct, we consider the language the prosecutor used, the context of the statements, the strength of the evidence, and whether the prosecutor repeated any misconduct.  *People v. Lovato*, 2014 COA

113, ¶ 64.  We also consider the absence of any objection from defense counsel because it may show counsel's "belief that the live argument, despite its appearance in [the] cold record, was not overly damaging."  *Id.* at ¶ 65 (quoting *People v. Wallace*, 97 P.3d 262, 269 (Colo. App. 2004)).

¶ 38    Considering these various factors, "[p]rosecutorial misconduct in closing argument rarely constitutes plain error."  *Liggett v. People*, 135 P.3d 725, 735 (Colo. 2006).  To rise to the level of plain error, misconduct in closing argument must be "flagrantly, glaringly, or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (citation omitted).

## C.    Analysis

¶ 39    Read in context, the prosecutor's comments did not attack or denigrate defense counsel; they attacked the nature and quality of the defense theory.  In other words, just as defense counsel was allowed to argue the viability of the defense theory, the prosecutor was allowed to argue it was implausible.  While the prosecutor was not entitled to offer his opinion about the officers' credibility, he was allowed to explain why the evidence supported the officers'

14

testimony and why the evidence did not support the defense theory. *See People v. Allee*, 77 P.3d 831, 836 (Colo. App. 2003). Describing the defense theory as "fiction" in alternative ways, such as equating it with movie plots, may have been an excessive rhetorical flourish, but such flourishes are allowed. *See People v. Rodriguez*, 2021 COA 38M, ¶ 31 (noting that many rhetorical flourishes or embellishments fall within the wide latitude permitted in a prosecutor's presentation style); *Allee*, 77 P.3d at 837. It is not misconduct to comment on defense counsel's tactics if such commentary is focused on the evidence and not on denigrating counsel. *See Allee*, 77 P.3d at 836. An argument "suggest[ing] to the jury that defendant's theory as to why the jury should find a reasonable doubt was so unlikely as to strain credibility" is not improper as long as it "permissibly focuse[s] the jury's attention on the evidence and the inferences that [can] be reasonably drawn from the evidence." *People v. Collins*, 250 P.3d 668, 678 (Colo. App. 2010). And the prosecutor's comments identifying the officers as public servants were made to refute the defense's theory. *See People v. Williams*, 996 P.2d 237, 245 (Colo. App. 1999)(no prosecutorial misconduct when the police officer's credibility was

the central issue at trial and both the prosecutor and defense counsel provided reasons to believe or to reject his testimony).

¶ 40　But what if we assume, for the purposes of argument, some of the prosecutor's comments fell on the wrong side of the line, such as the repeated use of the word "outrageous" or his references to the defense theory being "bad Hollywood drama" or "fiction with a plot line that doesn't work." *See People v. Cuellar*, 2023 COA 20, ¶ 74 ("[T]he prosecutor improperly denigrated defense counsel by telling the jury that defense counsel's statements about the victim were intolerable."). Defense counsel did not object to the repeated uses of the word "outrageous" or to the references to "bad Hollywood drama" or "fiction with a plot line that doesn't work," which suggests "the live argument, despite its appearance in [the] cold record, was not overly damaging." *Lovato*, ¶ 65 (citation omitted).

¶ 41　The prosecution's case was strong: Defendant was found with multiple bags containing methamphetamine and various items of drug paraphernalia. *See People v. Munoz-Casteneda*, 2012 COA 109, ¶ 33 (prosecutorial misconduct was not plain error when evidence of defendant's guilt was overwhelming). And, when

defense counsel objected to the prosecutor's statement that the defense theory was "one of the most outrageous claims I have heard in [the] many years I've been working as a district attorney," the court sustained the objection and instructed the jury to disregard the prosecutor's statement. *See Bondsteel v. People*, 2019 CO 26, ¶ 62 (absent evidence to the contrary, we presume the jury followed the court's instructions).

¶ 42 So, even assuming some of the prosecutor's comments were improper, we nonetheless conclude they were not so flagrantly, glaringly, or tremendously improper as to undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *See Liggett*, 135 P.3d at 735.

¶ 43 We recognize defendant braids his arguments — the court should have given the jury the instruction he requested, and the prosecutor committed misconduct during closing argument — together at one point. He submits his instruction

> would have properly and appropriately
> countered the prosecution's denigration of the
> defense theory [during closing argument] by
> instructing the jury that, under the law, it was
> actually permissible to infer police misconduct

> from some of the evidence presented in the case — such that the defense theory was not "outrageous."

¶ 44 But we concluded above defendant was able to present his defense theory thoroughly to the jury through evidence and argument. When combined with the court's credibility instruction, the jury understood it could acquit defendant if it thought the officers had planted the methamphetamine. In these circumstances, defendant's proposed instruction would not have been the ounce to make the pound of convincing the jury the officers engaged in misconduct, and the instruction would not have effectively blunted the prosecutor's attack on the defense theory's feasibility. The crux of the issue was, instead, what the jury thought of the evidence presented at trial.

¶ 45 The judgment is affirmed.

JUDGE MOULTRIE concurs.

JUDGE TAUBMAN specially concurs.

JUDGE TAUBMAN, specially concurring.

¶ 46    I agree with most of the majority opinion.  My only point of disagreement is with the majority's conclusion that the prosecutor's comments did not attack or denigrate defense counsel.  However, I agree with the majority that the prosecutor's comments did not constitute plain error, and therefore, I would also affirm the conviction of defendant, Keith Alan Smith.

¶ 47    As the majority correctly notes, a prosecutor may not denigrate defense counsel during closing argument.  *People v. Vasquez*, 2022 COA 100, ¶ 62, 521 P.3d 1042, 1055.  I also recognize that prosecutors have wide latitude in the language they use during closing arguments.  *People v. Duncan*, 2023 COA 122, ¶ 31, 545 P.3d 963, 972.

¶ 48    I part company with the majority, however, in its conclusion that the prosecutor attacked only the nature and quality of the defense theory, and not defense counsel.  While it is the prosecutor's obligation to argue that defense counsel's theory was implausible, he could have done so using more temperate language.  Even though the prosecutor may have tied his closing comments to

his belief that the defense theory was weak, he could have done so without impugning defense counsel's integrity.

¶ 49 When the prosecutor repeatedly stated that defense counsel's argument was "outrageous" and added that it was "bad Hollywood drama" and "fiction with a plot line that doesn't work," he was impermissibly denigrating defense counsel.

¶ 50 Even though many people these days engage in verbal excesses, we shouldn't countenance such language during a prosecutor's (or defense counsel's) closing argument.

¶ 51 Nevertheless, given that prosecutorial misconduct in closing argument rarely constitutes plain error, *Liggett v. People*, 135 P.3d 725, 735 (Colo. 2006), I conclude that the prosecutor's closing comments noted above do not rise to that level. Accordingly, I agree with the majority's conclusion that the prosecutor's closing remarks did not constitute plain error.