The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
June 18, 2026

## 2026 COA 51

**No. 24CA0166, *People v. Casey Simms* — Crimes — Menacing — By Use of Firearm, Knife, or Bludgeon — Fist; Criminal Law — Model Jury Instructions — Presumption of Innocence, Burden of Proof, and Reasonable Doubt**

In this direct criminal appeal, a division of the court of appeals considers the novel issue of whether a fist can be a "bludgeon" or "simulated bludgeon" under section 18-3-206, C.R.S. 2025, the felony menacing statute.

The majority on this issue (Moultrie and Taubman, JJ.) concludes that, as a matter of law, a fist cannot be a "bludgeon" or "simulated bludgeon" under the felony menacing statute because that interpretation is inconsistent with the statutory scheme, unsupported by the case law on which the People rely, and contrary to the statute's recent legislative history. The majority thus concludes that the trial court erred when, in response to a jury

deliberation question, the court declined to clarify that a fist cannot be a bludgeon or simulated bludgeon and that, under the circumstances, the court's error was not harmless. Accordingly, the majority reverses the defendant's felony menacing conviction. The dissent on this issue (Bernard, J.) concludes that while the plain and ordinary meaning of the word "bludgeon" does not include a fist, the trial court properly instructed the jury to give "bludgeon" its "ordinary meaning."

The division also considers whether the trial court erred by using the 2022 model criminal jury instruction on reasonable doubt. The majority on this issue (Moultrie and Bernard, JJ.) concludes that, consistent with the reasoning articulated by other divisions of this court in *People v. Melara*, 2025 COA 48, *People v. Schlehuber*, 2025 COA 50, and *People v. Berumen*, 2025 COA 93, the court did not err. The dissent on this issue (Taubman, J.) would hold that the instruction's "real possibility" language impermissibly lowered the prosecution's burden of proof.

Finally, the division considers the defendant's challenge to the court's award of restitution. Because the division concludes that the findings supporting the court's restitution award are

insufficient, the division vacates the award and remands for further proceedings regarding the determination of restitution.

Court of Appeals No. 24CA0166
Jefferson County District Court No. 23CR583
Honorable Norma A. Sierra, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Michael Casey Simms,

Defendant-Appellant.

JUDGMENT REVERSED, ORDER VACATED,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE MOULTRIE
Bernard*, J., concurs in part and dissents in part
Taubman*, J., concurs in part and dissents in part

Announced June 18, 2026

Philip J. Weiser, Attorney General, Frank R. Lawson, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Mark Evans, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1 Defendant, Michael Casey Simms,[1] appeals the judgment of conviction entered after a jury found him guilty of felony menacing.

¶ 2 Simms's charges resulted from a multiple-day altercation with his intimate partner. The case proceeded to a jury trial. Over Simms's counsel's objection, the court instructed the jury using the 2022 model criminal jury instruction on reasonable doubt. Additionally, during the deliberation phase, the jury submitted a question to the court inquiring whether a fist could be a "bludgeon" as that term is used in section 18-3-206, C.R.S. 2025, the felony menacing statute. The court declined to clarify whether a fist can be a bludgeon under the statute. Instead, it responded to the jury's question by instructing the jurors to give that term its "plain and ordinary meaning." Of the five offenses charged in the complaint and information, the jury convicted Simms of three — felony menacing and two misdemeanor assault charges. He was later sentenced and ordered to pay nearly $9,500 in restitution to the Crime Victim Compensation Board (CVCB) for money the

---

[1] Some trial court orders and documents show Simms's last name as "Casey-Simms," and the People also show his last name as "Casey-Simms." However, the defense's appellate briefing refers to him as "Mr. Simms," so we similarly refer to him as "Simms."

prosecution asserted the CVCB expended related to the victim's injuries.

¶ 3    Simms contends that the court erred by (1) instructing the jury using the 2022 model criminal jury instruction defining "reasonable doubt," which he asserts lowered the prosecution's burden of proof; (2) not adequately instructing the jury when it asked a question about an element of felony menacing; and (3) entering an order requiring him to pay restitution to the CVCB when the prosecution failed to substantiate the requested amount by providing the information required by section 18-1.3-603(10), C.R.S. 2025.

¶ 4    Our decision is split regarding Simms's first two contentions of error.  Judge Bernard and I agree that the trial court didn't err by instructing the jury using the 2022 model jury instruction on reasonable doubt; Judge Taubman diverges from our analysis and conclusions on the limited issue of whether the inclusion of the "real possibility" language in that instruction impermissibly lowered the prosecution's burden of proof.  As detailed in his partial dissent, he concludes that it did.

¶ 5    Conversely, Judge Taubman agrees with me that the trial court erred by not adequately responding to a jury deliberation question about an element of felony menacing. In reaching our conclusion with respect to Simms's second contention, Judge Taubman and I consider the novel issue of whether a fist can be a "bludgeon" or "simulated bludgeon" under the felony menacing statute. Because the two of us agree that, as a matter of law, a fist can't be considered a "bludgeon" or "simulated bludgeon" under that statute, and that the court's failure to provide the jury with an additional instruction stating as much wasn't harmless, we agree with Simms that his felony menacing conviction must be reversed. Judge Bernard explains his disagreement with our reasoning in his partial dissent regarding this contention of error.

¶ 6    However, we all agree that the court's award of restitution must be vacated because its findings supporting the award are insufficient. Specifically, it's unclear whether the award was predicated on Simms's felony menacing conviction (which we are reversing), Simms's misdemeanor convictions (which he doesn't contest on appeal), or some combination thereof. And because the issue may arise on remand, we briefly discuss the information that

the prosecution must provide to the court before the court can afford the prosecution the benefit of the rebuttable presumption in section 18-1.3-603(10).

## I.    Background

¶ 7    Simms and his girlfriend, K.B., were staying in a motel when they began to argue.  The argument culminated in Simms punching K.B., causing a black eye.

¶ 8    The next day, when K.B. returned to the motel room after work, the situation escalated again.  Throughout the evening, K.B. periodically left the motel room or locked herself in the motel room bathroom to seek refuge from Simms.  At one point, Simms breached the bathroom door after K.B. had locked herself inside, breaking the door in half.

¶ 9    Simms's testimony at trial differed from K.B.'s regarding the extent to which Simms physically assaulted K.B. on the second evening.  K.B. testified that Simms assaulted her multiple times, including by slapping, punching, kicking, and choking her.  K.B. also recounted Simms repeatedly threatening her verbally and with a pocketknife.  Although Simms admitted punching K.B., resulting in her black eye on the first night, and "getting physical" on the

second night,[2] he denied choking K.B. or threatening her with a pocketknife on the second night.

¶ 10 The following morning, K.B. called her grandmother, who lived in Utah, and she picked up K.B. and took her back to Utah after learning that K.B. and Simms had been fighting. After arriving in Utah, K.B. sought medical treatment for her injuries, and hospital staff reported the domestic dispute to law enforcement officers. Local police interviewed K.B. at the hospital in Utah and referred the case to police in Lakewood for further investigation.

¶ 11 Simms was tried by a jury on five charges: second degree kidnapping (seized and carried), felony menacing, felony second degree assault (strangulation), and two counts of misdemeanor third degree assault (one for the black eye on the first night and the other for injuries caused on the second night). To elevate the menacing charge to a felony, the prosecution had to prove that Simms committed menacing "by the use of a firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon." § 18-3-206.

---

[2] Based on these admissions, Simms conceded guilt on the two misdemeanor assault charges.

The prosecution's theory at trial, consistent with its charge, was that Simms menaced K.B. with the pocketknife.

¶ 12    At the close of evidence, the trial court instructed the jury using the 2022 model instruction on the beyond a reasonable doubt standard. It also instructed the jury on the elements of menacing, as follows:

> The elements of the crime of Menacing are:
>
> 1. That the defendant,
>
> 2. In the State of Colorado, at or about the date and place charged,
>
> 3. Knowingly,
>
> 4. By any threat or physical action,
>
> 5. Placed or attempted to place another person in fear of imminent serious bodily injury.

In the event the jury found Simms guilty of menacing, it was also asked to answer whether the "prosecution prove[d] beyond a reasonable doubt that the menacing was committed by the use of a firearm, knife, or bludgeon, or by the use of a simulated firearm, knife, or bludgeon." (If so, the conviction would be elevated to a felony.) The jury instructions provided a definition of "knife" but not of "bludgeon."

¶ 13 During deliberations, the jury asked, "Can a fist be considered a bludgeon?" Defense counsel advocated, based on "common sense" and their understanding of legislative intent, that the jury be instructed that a fist cannot be a bludgeon or simulated bludgeon for purposes of felony menacing. Noting that "jurors are asked to use their common sense in deliberations," the trial court rejected the defense's proposal and declined to "intervene or intercede itself into deliberations by providing a conclusive response to the jurors' question[]." The jury received the following response: "You have been provided all pertinent definitions. Words which are not defined are to be given their plain and ordinary meaning."

¶ 14 At the conclusion of the three-day trial, the jury returned guilty verdicts on the felony menacing charge and both misdemeanor assault charges and acquitted Simms of the felony assault and kidnapping charges. Before the sentencing hearing, the prosecution submitted a timely motion requesting restitution in the amount of $9,475.72 to reimburse the CVCB for its payments of K.B.'s medical expenses. Defense counsel filed a written objection to the motion. Defense counsel didn't contest Simms's general obligation to pay restitution but instead objected to the proposed

7

amount, asserting, "No supporting documentation was filed along with the request." The trial court sentenced Simms to two years in the custody of the Department of Corrections for the felony menacing conviction[3] and ordered Simms to pay the full amount of restitution requested by the prosecution.

## II. Analysis

### A. Jury Instruction on Reasonable Doubt

¶ 15     Because Simms's challenge to the 2022 model criminal jury instruction on reasonable doubt would, if sustained, require reversal of his convictions, we address it first. We conclude that the trial court didn't err by using that instruction.

¶ 16     Before 2022, the Colorado model criminal jury instructions provided the following definition of reasonable doubt:

> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

---

[3] The trial court also sentenced Simms to concurrent 280-day sentences for each misdemeanor assault conviction, which were deemed served through presentence confinement credit.

COLJI-Crim. E:03 (2021).

¶ 17    In 2022, the model instruction was substantially revised to provide as follows:

> Every person charged with a crime is presumed innocent.  This presumption of innocence remains with the defendant throughout the trial and should be given effect by you unless, after considering all the evidence, you are convinced that the defendant is guilty beyond a reasonable doubt.
>
> The burden of proof in this case is upon the prosecution.  The prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of each and every element necessary to constitute the crime charged.  This burden requires more than proof that something is highly probable, but it does not require proof with absolute certainty.
>
> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt.  If you are firmly convinced of the defendant's guilt, then the prosecution has proven the crime charged beyond a reasonable doubt.  But if you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt.
>
> After considering all the evidence, if you decide the prosecution has proven each of the elements of a crime charged beyond a reasonable doubt, you should find the defendant guilty of that crime.

> After considering all the evidence, if you decide the prosecution has failed to prove any one or more of the elements of a crime charged beyond a reasonable doubt, you should find the defendant not guilty of that crime.

COLJI-Crim. E:03 (2022).

¶ 18    Over Simms's counsel's objection, the trial court used the 2022 version of the model criminal jury instruction — rather than the prior version of the model instruction or counsel's proposed "hybrid" alternative instruction that fully incorporated the language from the prior version — to instruct the jury on the reasonable doubt standard.  Simms contends that the 2022 instruction undercuts the prosecution's burden of proof.  Two of us aren't persuaded.

### 1.    Legal Principles and Standard of Review

¶ 19    The trial court must properly instruct the jury on the reasonable doubt standard.  *Tibbels v. People*, 2022 CO 1, ¶ 25. Whether the court's instruction lowered the prosecution's burden of proof is a question of law that we review de novo.  *Id.* at ¶ 22.  "An instruction that lowers the prosecution's burden of proof below reasonable doubt constitutes structural error and requires automatic reversal."  *Johnson v. People*, 2019 CO 17, ¶ 8.

10

## 2. Application

¶ 20 Simms contends that the court erred by using the 2022 model instruction because that version

- didn't instruct the jury that it could consider the lack of evidence supporting the prosecution's case;

- didn't inform the jury that a doubt is reasonable if it "would cause reasonable people to hesitate to act in matters of importance to themselves";

- framed reasonable doubt as requiring a "real possibility that the defendant is not guilty" (thereby shifting the burden of proof to the defense and undermining the presumption of innocence); and

- instructed the jury that a reasonable doubt is one that leaves the jury "firmly convinced of the defendant's guilt."

¶ 21 While Simms's appeal was pending, three divisions of this court considered similar challenges to the 2022 model reasonable doubt instruction. *See People v. Melara*, 2025 COA 48, ¶¶ 22-23; *People v. Schlehuber*, 2025 COA 50, ¶¶ 16-17; *People v. Berumen*, 2025 COA 93, ¶ 14. In all three cases, the majorities concluded that the 2022 instruction doesn't lower the prosecution's burden of

11

proof.  *Melara,* ¶¶ 24, 30; *Schlehuber,* ¶¶ 2, 19, 28-29; *Berumen,*

¶¶ 29-30, 33.[4]  We agree with the reasoning of those majority

opinions and adopt it to resolve Simms's arguments, which we

address in turn.

¶ 22     First, the 2022 model instruction's omission of specific

language directing the jury that it may consider "the lack of

evidence" doesn't lower the prosecution's burden of proof because

the instruction as a whole informs the jury that "if the prosecution

fails to present sufficient evidence of guilt, it will not have met its

burden."  *Schlehuber,* ¶ 22.

¶ 23     Noting Judge Welling's concurrence in *Melara,* ¶ 122, Simms

argues that the 2022 model instruction didn't emphasize the

importance of a "lack of evidence" as clearly as the previous

---

[4] The Colorado Supreme Court has granted a petition for certiorari in *Teran-Sanchez v. People,* No. 25SC148, 2025 WL 2506067 (Colo Sep. 2, 2025) (unpublished order), to address "[w]hether the trial court's jury instruction on burden of proof and reasonable doubt, based on the 2023 Model Criminal Jury Instruction . . . violated [the defendant's] federal and constitutional rights to due process and a fair trial."  The 2023 version of the model instruction includes the "lack of evidence" language but is otherwise identical to the 2022 model instruction.  *See* COLJI-Crim. E:03 cmt. 8 (2023) ("In 2023, the Committee added the final sentence to the instruction's first paragraph regarding evidence or lack of evidence.").

instruction. And he urges us to conclude that the court's failure to include the "lack of evidence" language was reversible error. We aren't persuaded.

¶ 24    While inclusion of that language might have been better, *see Melara*, ¶ 28, the court's failure to include it here didn't amount to error. We agree with the *Schlehuber* division that "a court does not err by omitting that language" because "the concept of reasonable doubt inherently invites jurors to consider what evidence is missing" and "if the prosecution fails to present sufficient evidence of guilt, it will not have met its burden." *Schlehuber*, ¶¶ 20-22; *accord Berumen*, ¶ 33.

¶ 25    Second, we reject Simms's argument that because the "hesitate to act" language is "time-tested" in Colorado, without it, "jurors lack essential guidance for understanding reasonable doubt." We instead agree with the *Schlehuber* division that omission of the phrase clarifies the reasonable doubt standard by discouraging courts from using analogies to explain it. *See Schlehuber*, ¶ 27. And, in any event, "just because a proposed instruction is a correct statement of the law does not mean the instruction must be given or that it is the *only* correct way to

13

articulate the applicable law." *Id.* at ¶ 28; *see Victor v. Nebraska,* 511 U.S. 1, 5 (1994) ("[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." (citation omitted)).

¶ 26     Third, we aren't persuaded by Simms's argument that the "real possibility" language in the instruction holds a defendant to a higher standard than the law requires and skirts the line of directing a jury to determine whether a defendant is innocent, rather than simply requiring it to determine whether the prosecution has met its burden to demonstrate that a defendant is guilty.

¶ 27     The court's instruction said that "reasonable doubt" is a "real possibility that the defendant is not guilty" and that it "requires more than proof that something is highly probable." *See* COLJI-Crim. E:03 (2022). The "real possibility" language explains the prosecution's evidentiary threshold, and it instructs the jury not to acquit the defendant based on *any* conceivable doubt, no matter how improbable. *See Schlehuber,* ¶¶ 31, 34. This is an accurate

14

expression of the prosecution's burden of proof under the reasonable doubt standard. *Id.* at ¶¶ 30-31; *see Victor*, 511 U.S. at 24-27 (Ginsburg, J., concurring in part and concurring in the judgment) (concluding that similar model instruction language stated the reasonable doubt standard "succinctly and comprehensibly").

¶ 28 Moreover, "equating reasonable doubt with a 'real possibility' [doesn't] shift the burden to the defendant to establish that real possibility" because nothing about that phrase suggests that evidence from the defendant must be "the source of the 'real possibility.'" *Schlehuber*, ¶ 34 (quoting *United States v. Taylor*, 997 F.2d 1551, 1557 (D.C. Cir. 1993)); *accord Berumen*, ¶ 29. To the contrary, the court's instruction said that if a juror thinks "there is a real possibility that the defendant is not guilty, then *the prosecution* has failed to prove the crime charged beyond a reasonable doubt." (Emphasis added.) And the court's instruction correctly informed the jury that the burden of proof was "upon the prosecution" and that the "prosecution must prove to the satisfaction of the jury beyond a reasonable doubt the existence of

each and every element necessary to constitute the crime charged."
*See Berumen*, ¶ 28.

¶ 29    We acknowledge that Judge Berger's partial dissent in *Berumen,* with which Judge Taubman agrees here, raises legitimate concerns about the use of the "real possibility" language. *See id.* at ¶¶ 60-79 (Berger, J., concurring in part and dissenting in part). Nevertheless, we agree with the *Berumen* majority that the use of that phrase, when considered in context and as a part of the instructions as a whole, doesn't shift the prosecution's burden. *Id.* at ¶¶ 26-30 (majority opinion); *see also United States v. Petty*, 856 F.3d 1306, 1310 (10th Cir. 2017) (concluding that a similar definition of reasonable doubt that instructed the jury that it must acquit the defendant if there existed a "real possibility" that the defendant wasn't guilty was "a correct and comprehensible statement of the reasonable doubt standard" (quoting *United States v. Conway*, 73 F.3d 975, 980 (10th Cir. 1995))).

¶ 30    Fourth, we disagree with Simms's contention that the "firmly convinced" phrase in the court's instruction improperly asks jurors to base their conclusions about a defendant's guilt on their "gut feelings" that a defendant "just seems very guilty," rather than

basing their conclusions on evidence demonstrating that every element of a particular charge has been proved.

¶ 31    As the *Schlehuber* division explained, "[t]he phrase 'firmly convinced' correctly connotes a standard of 'near certitude'" — greater than "highly probable" but less than absolute certainty. *Schlehuber*, ¶ 31 (quoting *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).  And the court's instruction, including the phrase "firmly convinced," has been "consistently approved by federal courts as an accurate expression of the reasonable doubt standard."  *Id.* at ¶ 30; *see, e.g., Victor*, 511 U.S. at 24-27 (Ginsburg, J., concurring in part and concurring in the judgment) (endorsing a similarly worded instruction as "surpass[ing] others . . . in stating the reasonable doubt standard succinctly and comprehensibly"); *Petty*, 856 F.3d at 1310 (holding that a court's use of the "firmly convinced" language to describe the reasonable doubt standard "did not understate the degree of certainty a jury must reach to find a criminal defendant guilty"); *United States v. Velasquez*, 980 F.2d 1275, 1278 (9th Cir. 1992) ("Considering the instruction given as a whole, the use of the 'firmly convinced' language did not indicate to the jury that the

prosecutor had a lesser burden than that implied by the use of the term 'reasonable doubt' standing alone.").

¶ 32    Further, Simms's argument regarding the "firmly convinced" language ignores the court's other instructions germane to the prosecution's burden of proof.  Those instructions informed the jury that it had to presume Simms's innocence, consider all the evidence, assess the credibility of witnesses and conflicts in the evidence, and make its decision by applying rules of law provided by the court to the evidence (and reasonable inferences therefrom). Additionally, the court instructed the jury it was prohibited from basing its decision on "sympathy, bias, or prejudice."  "Absent a contrary showing, we presume that the jury followed th[ese] instruction[s]."  *People v. Dominguez-Castor*, 2020 COA 1, ¶ 91.

¶ 33    For these reasons, we discern no error in the court's decision to give the 2022 model instruction.

## B.    Jury Deliberation Question

¶ 34    Simms next contends that the trial court erred by responding incorrectly to the jury's question about an element of felony menacing.  Two of us agree.

18

### 1. Legal Principles and Standard of Review

¶ 35 Whether to provide the jury with additional written instructions in response to a question is a determination within the trial court's sound discretion. *People v. Bass*, 155 P.3d 547, 552 (Colo. App. 2006).

¶ 36 If a jury asks a question during deliberations, then the court should refer the jury to the original instructions "when it is apparent that the jury has overlooked some portion of the instructions or when the instructions clearly answer the jury's inquiry." *Leonardo v. People*, 728 P.2d 1252, 1255 (Colo. 1986). "When a term, word, or phrase in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required." *People v. Harris*, 2016 COA 159, ¶ 98. However, when the jury's question demonstrates that the jury has considered the relevant instruction and has a fundamental misunderstanding, or when the instructions provide no clear answer to the jury's question, the trial court must clarify the matter

19

for the jury in a concrete and unambiguous manner. *Leonardo*, 728 P.2d at 1255-56.

¶ 37     We review preserved claims of instructional error for nonconstitutional harmless error, reversing only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *People v. Koper*, 2018 COA 137, ¶ 9.

¶ 38     Because our analysis depends on the interpretation of the word "bludgeon" as used in the felony menacing statute, we also consider rules of statutory interpretation.

¶ 39     The trial court's interpretation of a statute presents a question of law that we review de novo. *People v. Rieger*, 2019 COA 14, ¶ 8. Our primary goal is to effectuate the legislature's intent, and, to do so, we look first to the language of the statute itself, reading words in context and construing them according to their plain and ordinary meanings. *See Garcia v. People*, 2022 CO 6, ¶ 17. We construe the statute as a whole to give "consistent, harmonious, and sensible effect to all [its] parts," and we avoid constructions that would lead to illogical or absurd results or render words superfluous. *Id.* (quoting *McCoy v. People*, 2019 CO 44, ¶ 38).

¶ 40    If the statute is clear and unambiguous, then we enforce the statute as written. *Nowak v. Suthers*, 2014 CO 14, ¶ 20. If, however, a statute is susceptible of more than one reasonable interpretation, then it's ambiguous, and we may turn to other interpretive aids. *Hice v. Giron*, 2024 CO 9, ¶ 10; *see* § 2-4-203, C.R.S. 2025.

## 2.    Application

¶ 41    Simms argues that the trial court erred by referring the jury to the original jury instructions in response to a jury deliberation question about whether a fist could be considered a "bludgeon" and that the error warrants reversal of his felony conviction. The People contend that, because the original jury instructions were accurate and sufficient, and because a fist may qualify as a bludgeon or simulated bludgeon, the trial court acted within its discretion by instructing the jury to apply the plain and ordinary meaning of "bludgeon." We agree with Simms that the jury's question required a clarifying response; specifically, that a fist is not a bludgeon or simulated bludgeon under the felony menacing statute. We also conclude that the trial court's error in not further instructing the jury accordingly wasn't harmless.

### a. Definition of "Bludgeon"

¶ 42    As noted, "[a] jury should be referred back to instructions only when it is apparent that the jury has overlooked some portion of the instructions or when the instructions clearly answer the jury's inquiry." *Leonardo*, 728 P.2d at 1255.  The original instructions provided no definition of "bludgeon"; therefore, the jury didn't overlook some portion of the instructions that could answer its question, nor did the instructions clearly answer the jury's question about whether a fist could be a bludgeon or simulated bludgeon. Thus, "[r]eferring the jur[ors] back to the same instruction that created the doubt in their minds could serve no useful purpose." *Id.*  Moreover, "the jury's question did not call for the judge to offer an opinion upon factual matters." *Id.*  Instead, the jury sought insight into whether — as a matter of law — a fist is a bludgeon or simulated bludgeon under the felony menacing statute.  The answer is no, as discussed further below, and because that issue was central to Simms's guilt, the trial court had an obligation to clarify that matter for the jury in a concrete and unambiguous manner. *See id.* at 1256.

¶ 43    Because the statute doesn't define "bludgeon," we may look to dictionary definitions of that term to ascertain its plain and ordinary meaning to determine how a reasonable juror might construe it. *See People v. Sims*, 2020 COA 78, ¶ 19; *cf. People v. Rigsby*, 2020 CO 74, ¶ 24 ("When the legislature includes particular definitions for terms it uses in a statute, those definitions, not an average person's understanding of the terms, govern."). But dictionary definitions of "bludgeon" demonstrate ambiguity as to whether a fist can be used as a bludgeon.

¶ 44    One definition of a bludgeon is "a short stick that usually has one thick or loaded end and is used as a weapon." Merriam-Webster Dictionary, https://perma.cc/CSV4-7QZH; *see also Bowers v. People*, 617 P.2d 560, 562 (Colo. 1980) (noting in an aggravated robbery case that "[a] bludgeon is defined in Webster's Third New International Dictionary as a short stick used as a weapon, usually having one thick or loaded end"), *superseded by statute on other grounds*, Ch. 212, sec. 2, § 18-1-901, 1981 Colo. Sess. Laws 972, *as recognized in Montez v. People*, 2012 CO 6; *People v. Braunhut*, 421 N.Y.S.2d 763, 765-66 (Crim. Ct. 1979) ("[A] bludgeon[,] within its traditional meaning, infers [a] rigid or

23

inflexible object," and "the functional definition of a bludgeon traditionally means the use of a heavy weighted and inflexible instrument which is intended to cause extensive physical injury, such as broken bones."). This definition, which implies that a bludgeon is an inanimate object rather than a body part, is in tension with the People's contention that a fist — or, perhaps more accurately, an arm with a fist at the end[5] — may be used as a bludgeon. A different dictionary notes that the frequency of "bludgeon" being used in this sense is about "0.1 occurrences per million words in modern written English," with its peak usage occurring in the mid-1800s. Oxford English Dictionary, https://perma.cc/64YQ-9EWH (see "How common is the noun *bludgeon*?" graphic, lower left portion of the webpage).

¶ 45    But another, more contemporary, definition of a bludgeon is broader: "something used to attack or bully." Merriam-Webster Dictionary, https://perma.cc/CSV4-7QZH. These differing definitions, coupled with the jury's question, demonstrate a lack of

---

[5] Applying the first dictionary definition of bludgeon, we interpret the People's argument that a fist can simulate a bludgeon to suggest that an arm could be construed as the "short stick" and the fist could be construed as the "thick or loaded end."

clarity as to the plain and ordinary meaning of "bludgeon" that warranted further examination and required clarification by the trial court when the jury demonstrated its confusion.

¶ 46    Thus, because we recognize some ambiguity as to the meaning of the word "bludgeon," we turn to other tools of statutory construction. In doing so, we reject the People's assertion that a fist can be a bludgeon or a simulated bludgeon for three reasons.

¶ 47    First, construing "bludgeon" to include a fist is inconsistent with the statutory scheme. Even if we accept the reasoning advanced by the People — that the way in which an object is used is relevant to determining whether it is a bludgeon — we still can't accept their argument that a fist can be construed as a bludgeon in the context of the felony menacing statute. *See Garcia*, ¶ 17.

¶ 48    "The statute prohibits knowingly placing or attempting to place another person in fear of imminent serious bodily injury, and it provides that doing so with a [firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon] is a felony." *People v. Romero*, 2025 COA 91, ¶ 18. While we don't doubt that a person's fists can cause serious bodily injury, we conclude that fists are meaningfully different from types of weapons listed in the statute.

25

*See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."); *see also People v. Vue*, 818 N.E.2d 1252, 1257 (Ill. App. Ct. 2004) ("[A]lthough a [pellet gun] might be capable of being used as a bludgeon, it is not typically identified as such and . . . could not be interpreted to be 'of like character' to the bludgeon-type weapons included in [the statute]." (citation omitted)).

¶ 49    As has long been recognized, objects like firearms, knives, and bludgeons pose a distinct and greater risk of severe injury compared to fists.  *See, e.g., Norton v. State*, 14 Tex. 387, 387 (1855) (recognizing the use of "bludgeons, missiles[,] or instruments or weapons of any kind capable of inflicting injury *beyond what may ordinarily be inflicted by a blow with the fist*" as an aggravating circumstance (emphasis added)).  Accordingly, the felony menacing statute's listed items — "firearm, knife, or bludgeon" — share the characteristic of being inanimate objects that *inherently* pose a significant risk of severe injury, which makes them meaningfully different from fists.

26

¶ 50    Second, the People's reliance on a line of cases holding that fists and other objects may qualify as deadly weapons, depending on the way those objects are used, is unavailing.  *See, e.g.*, *People v. Saleh*, 45 P.3d 1272, 1275 (Colo. 2002) ("Body parts can be deadly weapons depending upon the manner in which they are used."); *People v. Hayes*, 923 P.2d 221, 227 (Colo. App. 1995) ("Any object, including a fist, can be a deadly weapon if it is used or intended to be used in a manner capable of producing death or serious bodily injury.").

¶ 51    This line of cases is inapposite because they interpret the definition of a "deadly weapon," which lists *not only* bludgeons, but also "any other weapon, device, instrument, material, or substance, whether animate or inanimate, that, in the manner it is used or intended to be used, is capable of producing death or serious bodily injury." § 18-1-901(3)(e), C.R.S. 2025; *see also Saleh*, 45 P.3d at 1275 ("The phrase 'any other weapon, device, instrument, material or substance, whether animate or inanimate' in section 18-1-901(3)(e) is a general provision applying to any and all objects *other than a firearm, knife, or bludgeon*." (emphasis added)).  Thus, it's no surprise that when a statute contemplates "deadly weapons,"

27

fists are included — not as a form of bludgeon, but as "any other" object capable of producing serious injury.

¶ 52    By contrast, the felony menacing statute contemplates *only* the use of a "firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon." § 18-3-206.  Because the felony menacing statute applies to the use of a narrower, defined category of weapons, we find unpersuasive the People's argument that fists may be considered bludgeons or simulated bludgeons because they may qualify as deadly weapons.

¶ 53    The third, and most persuasive, reason is that the legislative history belies the People's construction of the statute.  "Before 2022, the menacing statute provided that menacing was a felony if committed '[b]y the use of a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon.'"  *Romero*, ¶ 13 (quoting § 18-3-206, C.R.S. 2021).  As discussed above, the definition of a "deadly weapon" is much broader than the enumerated list of "firearm, knife, or bludgeon" because it includes a catchall provision.  And "[e]ffective March 1, 2022, the [General Assembly] amended the menacing statute to provide that menacing [is] a felony 'if

28

committed by the use of a firearm, knife, or bludgeon or a simulated firearm, knife, or bludgeon.'" *Id.* at ¶ 15 (quoting § 18-3-206, C.R.S. 2025).

¶ 54     The *Romero* division recognized that "the amendment indicates the legislature's intent to narrow the scope of items that can trigger a felony menacing charge." *Id.* at ¶ 21.  Because we "presume that the legislature is aware of the previously expressed legal importance of the words and phrases it uses," *People v. Rockwell*, 125 P.3d 410, 417 (Colo. 2005), we agree with the *Romero* division that the General Assembly intended to limit the broad language of the previous version of the statute.  *See People v. O'Neal*, 228 P.3d 211, 214 (Colo. App. 2009) ("[T]he most relevant time period for determining a statute's meaning is the time when the statute was enacted . . . .").  Accordingly, we further conclude that the felony menacing statute does not permit a fist to serve as a bludgeon or simulated bludgeon.

¶ 55     In his partial dissent, Judge Bernard argues that the court didn't err because (1) the plain and ordinary meaning of the word "bludgeon" — as evidenced primarily by case law from other jurisdictions — is "straightforward" and doesn't contemplate a fist,

29

*infra* ¶ 98; and (2) after jurors asked for clarification of that term, the court directed them to apply that term's plain and ordinary meaning. He thus contends that the court's additional instruction to apply the "plain and ordinary" meaning of "bludgeon" was sufficient to remediate the jurors' confusion. We disagree.

¶ 56 A word's meaning is "plain" if it "cannot be read in any other way." Marco Basile, *Ordinary Meaning and Plain Meaning*, 110 Va. L. Rev. 135, 156 (2024) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)). And the common or "ordinary" meaning of a word in a legal context "is generally informed by considerations of *how readers of the text would actually understand it*," Kevin P. Tobia, *Testing Ordinary Meaning*, 134 Harv. L. Rev. 726, 739 (2020), which, in turn, is often discerned through dictionary definitions. *See also* Basile, 110 Va. L. Rev. at 151 ("[O]rdinary meaning is what the statutory text would convey to a reasonable English user in . . . 'ordinary' communication.").

¶ 57 Indeed, the courts in each of the cases Judge Bernard references turned to dictionaries to discern the "plain and ordinary" meaning of the word "bludgeon," just as we have done. Yet jurors, who aren't expected to know relevant law, *People v. Clemens*, 2017

CO 89, ¶ 17, are prohibited from doing the same, *Sims*, ¶ 19. Rather, "jurors must obtain clarifications of any ambiguities in terminology from the trial judge, not from extraneous sources." *Niemand v. Dist. Ct.*, 684 P.2d 931, 934 (Colo. 1984).

¶ 58 As we've concluded, the common meaning of the word "bludgeon" has multiple reasonable interpretations, and jurors exhibited confusion as to the legal significance of that term under the circumstances of this case. We therefore disagree with Judge Bernard that it was sufficient for the trial court to instruct the jurors that they should apply the plain and ordinary meaning of "bludgeon." Instead, the trial court was obligated to provide a definite and unambiguous answer regarding the term's meaning. *See Leonardo*, 728 P.2d at 1256; *Garcia,* ¶¶ 16-17.

¶ 59 By not clarifying that a fist *cannot* be considered a bludgeon under the felony menacing statute, the trial court left open the possibility that the jury convicted Simms of felony menacing because he used his fists, a meaning that the General Assembly didn't contemplate. This was error. However, the court's error only warrants reversing Simms's felony menacing conviction if it substantially influenced the verdict or affected the fairness of the

trial proceedings. *See Hagos v. People*, 2012 CO 63, ¶ 12. Accordingly, we next consider whether the court's error was harmless.

### b.    Harmlessness

¶ 60    Whether a fist could be considered a bludgeon related to a central element of the crime of felony menacing. *See Leonardo*, 728 P.2d at 1256. Indeed, the question related to the only element required to elevate the conviction from a misdemeanor to a felony. The People argue that the jury's split verdict demonstrates that it carefully parsed and fully credited K.B.'s testimony, and thus any error concerning the jury deliberation question was harmless because K.B.'s testimony supported Simms's conviction for felony menacing using a pocketknife.

¶ 61    But we agree with Simms that if the jurors believed K.B.'s testimony about Simms's use of a knife and were "inclined to convict Mr. Simms of menacing with a knife . . . , they would not have asked if a fist can be considered a bludgeon." While Simms was formally charged with felony menacing only by use of a knife, the jury instructions tracked the broader statutory language, allowing the jury to convict Simms if it found that he menaced K.B.

by the use of instruments *other than* a knife — namely, as relevant here, a bludgeon or a simulated bludgeon.

¶ 62     Thus, regardless of whether K.B.'s testimony *could have* supported a felony menacing conviction based on the theory that Simms used a knife, the jury's question casts sufficient doubt about whether it convicted Simms based on his use of a pocketknife or based on his use of his fists, which, as discussed above, is not permitted under the statute. *See Garcia*, ¶¶ 26-27, 30, 37-38, 40 (explaining that the trial court's instructional error, which the jury could have understood to allow a conviction on an improper basis, related to a "hotly contested" charge and warranted reversal).

¶ 63     In light of this uncertainty, we conclude that a reasonable possibility exists that the trial court's error in not adequately responding to the jury's question contributed to Simms's felony menacing conviction. *See Leonardo*, 728 P.2d at 1256 (concluding that "the court committed prejudicial error when it failed to respond adequately to the jury's inquiry" that was "related to a central element" of the charged offense). Therefore, we must reverse Simms's felony menacing conviction.

## C. Restitution Award

¶ 64  Finally, we consider Simms's argument that the trial court erred by awarding $9,475.72 in restitution, payable to the CVCB, because the prosecution didn't properly establish the amount of assistance provided by the CVCB, as section 18-1.3-603(10) requires.

¶ 65  As an initial matter, the parties dispute whether Simms has preserved the precise issue he raises on appeal. We need not definitively resolve this issue because, as we discuss below, the court's findings are insufficient for us to determine the basis of its restitution award. If the court's award of restitution was based solely on Simms's now-reversed felony menacing conviction, it cannot stand. Accordingly, we vacate the award and remand to the trial court for determination of restitution, if any, consistent with this opinion.

### 1. Legal Principles and Standard of Review

¶ 66  Individuals convicted of a crime must "make full restitution to those harmed by their misconduct." § 18-1.3-601(1)(b), C.R.S.

2025.[6] The restitution statute therefore requires every order of conviction for a felony or misdemeanor to include one of four types of restitution orders, including, as relevant here, an order that a defendant pay a specific amount of restitution. § 18-1.3-603(1)(a); *People v. Weeks*, 2021 CO 75, ¶ 3. The court must base its order for restitution on information presented by the prosecuting attorney. § 18-1.3-603(2)(a). And "[i]n a restitution proceeding, the prosecution bears the burden of proving by a preponderance of the evidence not only the victim's losses, but also that the victim's losses were proximately caused by the defendant's criminal conduct." *People v. Martinez-Chavez*, 2020 COA 39, ¶ 14.

¶ 67     When a CVCB pays a victim's claim for losses, it may recover that amount from a defendant. *See id.* at ¶ 13; § 18-1.3-602(4)(a)(IV), C.R.S. 2025. Losses compensable by a CVCB include "[r]easonable medical and hospital expenses." § 24-4.1-109(1)(a), C.R.S. 2025.

¶ 68     The restitution statute requires the court to consider the amount of assistance provided and requested by a CVCB in

---

[6] We cite the 2025 version of the statute because the portions relevant to our analysis haven't changed since Simms's conviction.

determining the restitution amount and creates a rebuttable presumption that a CVCB claim is a direct result of the defendant's criminal conduct. § 18-1.3-603(10)(a); *People v. Stone*, 2020 COA 24, ¶ 24. To be entitled to the presumption that the amount paid by a CVCB for a victim's medical expenses is the "direct result of the defendant's criminal conduct," section 18-1.3-603(10) requires the prosecution to provide either "[a] list of the amount of money paid to each provider" or, "[i]f the identity or location of a provider would pose a threat to the safety or welfare of the victim, summary data reflecting what total payments were made for." § 18-1.3-603(10)(a), (b)(I)-(II)(A). Detailed findings help avoid the risk of a remand due to inadequate explanation or insufficient reasoning concerning a restitution order. *People v. Le*, 2022 COA 32, ¶ 37.

¶ 69     We review a trial court's application of the restitution statute for an abuse of discretion. *People v. Gregory*, 2019 COA 184, ¶ 21. A trial court abuses its discretion when it misconstrues or misapplies the law. *Id.*; *accord People v. Fregosi*, 2024 COA 6, ¶ 39.

## 2. Application

¶ 70 Despite the majority's reversal of Simms's felony menacing conviction, he remains responsible for paying restitution because he was convicted of two counts of misdemeanor assault. *See* § 18-1.3-603(1)(a). He doesn't contest his conviction on the misdemeanor counts.

¶ 71 Section 18-1.3-603(1)(a), (10)(a) obligated the court to enter an award of restitution in which it considered the losses incurred by the CVCB in determining the amount. The prosecution's restitution motion said only that the CVCB had paid $9,475.72. It didn't explain what those funds were expended for or include any information regarding the convictions (i.e., the "misconduct" on which its restitution request was based). § 18-1.3-601(1)(b).

¶ 72 The prosecution later submitted to the court a report from the CVCB in support of the restitution motion. The report included a statement that the requested funds had been expended for K.B.'s verified "medical expenses." However, the report contained neither a list of providers and the amount of money paid to each nor summary data reflecting the purpose of the total amount requested, supported by evidence that a summary was appropriate in the

interest of K.B.'s safety or welfare.  *See Martinez-Chavez,* ¶ 20 ("In their motion for restitution, the People did not provide a list of providers nor did they even argue that disclosure of such a list would pose a threat to the safety or welfare of any victim.").

¶ 73     Similarly, at Simms's sentencing hearing, the prosecution didn't submit to the court, through evidence or argument, any additional information about K.B.'s specific providers or summary data in lieu of provider-specific information.  And although the prosecutor appears to have argued that the basis for the medical expenses was the two misdemeanor assault charges, the court's findings are silent as to the specific misconduct by Simms that supported the imposition of the restitution award.  Instead, the court merely stated that it had reviewed the restitution statute, that the CVCB had received confidential records that "resulted in the provision of $9,475.72 to [K.B.]," and that the "those restitution amounts are imposed."

¶ 74     These findings are insufficient for us to determine whether the court gave the prosecution the benefit of section 18-1.3-603(10)'s rebuttable presumption, and, if not, the basis on which the court determined that Simms's conduct proximately caused the entirety

of K.B.'s claimed losses. Accordingly, we vacate the restitution award and remand for further proceedings regarding the determination of restitution. *See People v. D.F.*, 933 P.2d 9, 14 (Colo. 1997) ("When appellate review is hindered by the absence of factual findings as to key contested issues, or when unresolved evidentiary conflicts exist with regard to material facts, we have remanded for further fact finding by the trial court.").

¶ 75 Should the issue arise on remand, the trial court may not apply the rebuttable presumption of causation unless the prosecution satisfies section 18-1.3-603(10)(b)'s requirements and must otherwise hold the prosecution to its burden of proving that the amount of assistance the CVCB provided was attributable to Simms's conduct.

### III. Disposition

¶ 76 The felony menacing conviction is reversed, the restitution order is vacated, and the case is remanded for further proceedings consistent with this opinion.[7]

JUDGE BERNARD concurs in part and dissents in part.

---

[7] The two misdemeanor assault convictions, which Simms didn't challenge on appeal, remain undisturbed.

JUDGE TAUBMAN concurs in part and dissents in part.

JUDGE BERNARD, concurring in part and dissenting in part.

¶ 77    I concur with Part II.A of the majority opinion, which concludes the reasonable doubt instruction used in this case was not unconstitutional.  I also concur with Part II.C concerning the restitution award.  But I disagree with Part II.B, which concludes the trial court did not adequately respond to the jury's question, "Can a fist be considered a bludgeon?"  I therefore respectfully dissent from Part II.B, and I would affirm defendant's conviction for felony menacing.

## I.    Introduction

¶ 78    I begin by looking to the lay of the land in this appeal.  I start with defendant's contention concerning the jury's question, "Can a fist be considered a bludgeon?"  I next address how the prosecution answers defendant's contention.  And I last consider the majority's analysis of the issue.

¶ 79    Defendant contends "the court erred by failing to properly instruct the jury when they exhibited confusion about the elements of felony menacing.  When the jury asked whether a fist could be considered a 'bludgeon,' the court merely referred them back to the

41

original instructions rather than providing the necessary clarification."

¶ 80    The prosecution responds "there are factual circumstances in which a 'fist' would likely qualify" as a bludgeon.  As a result, the prosecution proposes, "it was appropriate for the court to avoid a definitive response that would have encompassed a factual determination and instead instruct the jury that any undefined terms were to be given their plain and ordinary meaning."

¶ 81    The majority asserts dictionary definitions of the word "bludgeon" "demonstrate ambiguity as to whether a fist can be used as a bludgeon."  *Supra* ¶ 43.  The majority recognizes the primary definition of the term indicates a bludgeon is an object, but it then points to a secondary definition — "something used to attack or bully" — that the majority states "demonstrate[s] a lack of clarity as to the plain and ordinary meaning of 'bludgeon.'"  *Supra* ¶ 45.  This lack of clarity about the definition of the term, the majority continues, "warranted further examination and required clarification by the trial court when the jury demonstrated its confusion."  *Supra* ¶ 45.  Then, the majority goes on, it "recognize[s] some ambiguity as to the meaning" of "bludgeon," so it "turn[s] to

42

other tools of statutory construction." *Supra* ¶ 46. Next, the majority rejects the prosecution's "assertion that a fist can be a bludgeon or a simulated bludgeon." Ultimately, the majority concludes that "[b]y not clarifying that a fist *cannot* be considered a bludgeon under the felony menacing statute, the trial court left open the possibility that the jury convicted [defendant] of felony menacing because he used his fists, a meaning that the General Assembly didn't contemplate." *Supra* ¶ 59.

¶ 82     As I explain in more detail below, I think the trial court's response to the jury's question ("You have been provided all pertinent definitions. Words which are not defined are to be given their plain and ordinary meaning.") clearly told the jury a fist could not be a bludgeon. I therefore submit the prosecution's contention that a fist can be a bludgeon in certain circumstances is beside the point. And I disagree with the majority's conclusion that defendant's conviction should be reversed because the trial court did not specifically instruct the jury a fist was not a bludgeon.

## II.     General Legal Principles

¶ 83     When terms are not defined in a jury instruction, the general rule is "the jury is presumed to employ the common meaning of the

words used." *People v. Walden*, 224 P.3d 369, 379 (Colo. App. 2009). In other words, "[w]hen a term . . . in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required." *People v. Harris*, 2016 COA 159, ¶ 98.

¶ 84    But what should a court do when a jury expresses some confusion about the meaning of a term that is not defined elsewhere in the instructions? In *Leonardo v. People*, 728 P.2d 1252, 1258 (Colo. 1986), the supreme court decided a question from a jury in a criminal case "betrayed a serious misunderstanding regarding the culpable mental state" of the crime with which the defendant had been charged. The trial court responded to this question by instructing the jury to reach a verdict by "applying the words as you find them in the instructions." *Id.* at 1254.

¶ 85    The supreme court concluded the trial court's response was inadequate. "[W]hen the jury indicates to the judge that it does not understand . . . some . . . matter of law central to the guilt or innocence of the accused, the judge has an obligation to clarify that matter for the jury in a concrete and unambiguous manner." *Id.* at

44

1256.  In *Leonardo*, "[t]he jury's confusion . . . could have been removed by a simple and direct response."  *Id.*  By not offering such a response, the trial court committed "prejudicial error."  *Id.*

### III.  Analysis

¶ 86  To begin, in response to the jury's question in this case, the trial court did more than merely instruct the jury to "apply[] the words as you find them in the instructions."  *Id.* at 1254.  Rather, the court told the jury it had "been provided all pertinent definitions," *and* "words which *are not defined* are to be given their plain and ordinary meaning."  (Emphasis added.)  To put it a different way, the trial court told the jury to apply the general rule I identified above, which had not been previously included in the instructions.  By applying the general rule, and by looking to the "plain and ordinary meaning" of the term "bludgeon," I conclude the jury was adequately instructed a fist was not a bludgeon.

¶ 87  In Colorado, our supreme court considered the meaning of "bludgeon" in *Bowers v. People*, 617 P.2d 560, 562 (Colo. 1980), *superseded by statute on other grounds*, Ch. 212, sec. 2, § 18-1-901, 1981 Colo. Sess. Laws 972, *as recognized in Montez v. People*, 2012 CO 6, ¶ 14: "A bludgeon is defined by Webster's Third

45

New International Dictionary as a short stick used as a weapon, usually having one thick or loaded end."

¶ 88    Definitions of "bludgeon" used in other jurisdictions are much the same as this one.

¶ 89    In *United States v. Sicurella,* 367 F.3d 82, 86 n.1 (2d Cir. 2004), the court, referring to a dictionary, defined a "bludgeon" as "a short stick used as a weapon usually having one thick, heavy, or loaded end." (Citation omitted.)

¶ 90    In *Harris v. State,* 398 So. 2d 777, 779 (Ala. Crim. App. 1981), the court looked to a dictionary to define a "bludgeon" as "a short stick, with one end loaded, or thicker and heavier than the other, used as an offensive weapon, hence any clublike weapon." (Citation omitted.)

¶ 91    In *Jamison v. Commissioner of Correction,* 143 A.3d 1136, 1143 (Conn. App. Ct. 2016), the court observed that "not all dictionary definitions of bludgeon describe a bludgeon as being heavy. It may be a short stick with one thick or loaded end. . . . [S]ynonyms for bludgeon routinely include the words bat, club, stick, and truncheon."

¶ 92    In *People v. Fink*, 437 N.E.2d 623, 624 (Ill. 1982), a trial court consulted "various dictionaries," which "generally define[d] a 'bludgeon' as a short, heavy stick or club with one end loaded or thicker or heavier than the other."

¶ 93    *People v. Malik*, 245 N.W.2d 434, 436 (Mich. Ct. App. 1976), lists three definitions of "bludgeon" from three dictionaries: a "short stout stick or club, with one end loaded or thicker and heavier than the other, used as a weapon"; a "short, heavy club with one end weighted, or thicker and heavier than the other"; and "1. a short stick that usu. has one thick or loaded end and is used as a weapon. 2: something used to attack or bully."  (Citations omitted.)

¶ 94    *State v. Tims*, 324 A.2d 45, 47 (N.J. Super. Ct. App. Div. 1974), looked to a dictionary to define "bludgeon" as "a short stick used as a weapon, usually having one thick, heavy, or loaded end [or] . . . any similar weapon."  (Citation omitted.)

¶ 95    *People v. Jin Lu*, 960 N.Y.S.2d 295, 296-97 (Crim. Ct. 2013), lists three definitions used in other New York cases: a "short stick, with one end loaded or thicker and heavier than the other, used as an offensive weapon"; "a short club commonly loaded at one end or bigger at one end than the other, used as a weapon"; and a "rigid or

47

inflexible object, weighted, thicker or heavier on one side, used as an offensive weapon."  (Citations omitted.)

¶ 96     *Malik*, 245 N.W.2d at 436, indicates there is a secondary definition of "bludgeon": It can be "something used to attack or bully."  (Citation omitted.)  I could only find one other published case referring to this secondary definition, and it quotes *Malik*: *People v. Tate*, 386 N.E.2d 584, 585 (Ill. App. Ct. 1979).  Neither of these cases spends much time on the secondary definition, and neither one hints "something used to attack or bully" would include a fist.

¶ 97     Looking to *What Constitutes a "Bludgeon," "Blackjack," or "Billy" within Meaning of Criminal Possession Statute*, 11 A.L.R.4th 1272 (1982), one will search in vain to find a bludgeon described as a fist, or, for that matter, as a hand, a knee, a foot, an elbow, or any other part of the human body.

¶ 98     Based on this authority, I conclude the plain and ordinary meaning of the word "bludgeon" is straightforward.  There are commonalities among the various definitions listed above.  A bludgeon is a stick or a club; one end is usually thicker or heavier

48

than the other, or it is loaded; it is used as a weapon.  It is an object, a thing; it is not part of a human body, such as a fist.

¶ 99    The consistency and clarity of the definitions of "bludgeon" in cases throughout the United States refute defendant's contention and the prosecution's position.  When, in response to the jury's question, the court instructed the jury to give "[w]ords which are not defined . . . their plain and ordinary meaning," the court provided a sufficient answer: Employing the plain and ordinary meaning of "bludgeon," a fist cannot be one.  And, during the trial, the prosecution never argued a fist could be a bludgeon.  The focus of the prosecution's case was, instead, that defendant had menaced the victim with a knife.

¶ 100   I therefore think the prosecution's appellate contention — "there are factual circumstances in which a 'fist' would likely qualify" as a bludgeon — is a red herring.  This contention is simply inconsistent with the plain meaning of the term.  But I agree with the core of the next part of the prosecution's contention, which I would rephrase to read like this: It was appropriate for the court to instruct the jury that any undefined terms were to be given their plain and ordinary meanings because, when looking at the word

"bludgeon," the plain and ordinary meaning of "bludgeon" does not include a fist.

¶ 101   Last, I reject, for two reasons, the majority's position that the secondary definition of the term "bludgeon" renders it ambiguous.

¶ 102   First, remembering the issue in this appeal is whether the court's instruction sufficiently informed the jury a fist was not a bludgeon, I have already concluded the court's instruction did just that.

¶ 103   Second, "[c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). Indeed, "any word in the English language — except for words of specialized contexts, such as mathematics or science — will ordinarily have multiple meanings, depending on the context in which it has been used." *Cmty. Renewal Team, Inc. v. U.S. Liab. Ins. Co.*, 17 A.3d 88, 92 (Conn. App. Ct. 2011).

¶ 104   "That is why we have dictionaries: not to determine *the* meaning of a given word, or even *the preferred* meaning of a given word, but simply to give us a lexicon of the various meanings that the word has carried depending on the various contexts of its use."

*Id.* "[S]imply because a given word . . . has carried different meanings in different contexts in the English language" does not mean it is necessarily ambiguous. *Id.* at 93. "If that were so, then for all practical purposes all such words . . . would be ambiguous, because we would always be able to point to some other meaning that the word has carried in some other context." *Id.* "There is little doubt that imagination can conjure hypothetical cases in which the meaning of . . . terms will be in nice question." *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 412 (1950).

¶ 105    Keeping these principles about language and ambiguity in mind, I quote a British philosopher who once wrote, in a different context, "[a]ccepting that the world is full of uncertainty and ambiguity does not and should not stop people from being pretty sure about a lot of things." Julian Baggini, *What Is This Foolish Lust for Uncertainty?*, The Guardian (Oct. 28, 2011), https://perma.cc/83RQ-FJN6. Following Mr. Baggini's advice in this case, I am more than "pretty sure" the word "bludgeon" is not ambiguous; I am confident it is not.

JUDGE TAUBMAN, concurring in part and dissenting in part.

¶ 106    I concur with Parts II.B and II.C of the majority opinion because I agree that the felony menacing conviction must be reversed and that there are insufficient findings to support the court's award of restitution to the Crime Victim Compensation Board. However, I dissent from Part II.A because I would also reverse Simms's felony menacing conviction and remand his case for a new trial using a different reasonable doubt instruction. Specifically, I believe that the use of the "real possibility" language in the 2022 model criminal jury instructions impermissibly lowered the prosecution's burden of proof.

¶ 107    As the majority notes, the validity of the 2022 model criminal jury instruction on reasonable doubt has been challenged in several cases, including one in which the supreme court has granted certiorari. *See supra* ¶ 21 & n.4 (citing *Teran-Sanchez v. People*, (Colo. No. 25SC148, Sep. 2, 2025) (unpublished order)); *cf. Chavez v. Chavez*, 2020 COA 70, ¶ 13, 465 P.3d 133, 138 (explaining that "divisions are not bound by the decisions of other divisions").

¶ 108    I dissent in part, consistent with my prior stance on this issue — *see People v. Green*, slip op. at 26-28, 2026 WL 407549

(Colo. App. No. 23CA1305, Feb. 12, 2026) (not published pursuant to C.A.R. 35(e)) (Taubman, J., concurring in part and dissenting in part) — because I agree with Judge Berger's persuasive partial dissent in *People v. Berumen*, 2025 COA 93, ¶¶ 60-79, 583 P.3d 1264, 1275-78 (Berger, J., concurring in part and dissenting in part), that the third paragraph of the 2022 model jury instruction on reasonable doubt impermissibly lowers the prosecution's burden of proof.  That paragraph, in pertinent part, states, "[I]f you think there is a real possibility that the defendant is not guilty, then the prosecution has failed to prove the crime charged beyond a reasonable doubt."  COLJI-Crim. E:03 (2022).

¶ 109  I agree with Judge Berger that the "real possibility" language creates ambiguity and confusion as to the meaning of reasonable doubt.  *See Berumen*, ¶¶ 66-68, 583 P.3d at 1276-77 (Berger, J., concurring in part and dissenting in part).  The "real possibility" language may lead a jury to believe that it may acquit a defendant *only if* it believes there is a real possibility the defendant did not commit the charged offense, and not if the prosecution simply failed to meet its burden.  *Id.* at ¶¶ 67-68, 583 P.3d at 1277; *cf. United States v. Williams*, 20 F.3d 125, 131 (5th Cir. 1994) ("When read in

the context of the charge as a whole, the instruction's 'real possibility' formulation explains that the beyond a reasonable doubt standard does not require 'proof that overcomes every possible doubt.' In other words, the modifier 'real' merely indicates that the jury *is not to acquit a defendant* if it can conceive of *any* possibility that the defendant is not guilty." (emphasis added)). Because there are many permissible bases for a jury to acquit, the implication that a jury may acquit only on the basis that there is a real possibility that the defendant is not guilty impermissibly lowers the prosecution's burden of proof. *Berumen*, ¶ 69, 583 P.3d at 1277 (Berger, J., concurring in part and dissenting in part).

¶ 110 The problems posed by the "real possibility" language are well illustrated by this case. As discussed in the majority opinion, the trial court erred by not adequately responding to a jury deliberation question concerning an element of felony menacing, in effect allowing the jury to incorrectly believe that it could convict Simms based on his use of his fists as a bludgeon or simulated bludgeon. Coupled with this instructional error, the use of the "real possibility" language may have prevented the jury from concluding that there was a "real possibility" that Simms did not commit felony

menacing because there was no genuine dispute at trial about whether Simms used his fists in at least one altercation with K.B. Thus, the "real possibility" language not only lowered the prosecution's burden of proof in this case, it also effectively precluded acquittal on Simms's felony menacing charge when considered alongside the evidence admitted at trial and the trial court's instructional error.

¶ 111    I also agree that, while "reading the challenged sentence in context makes the question closer," *id.* at ¶ 70, 583 P.3d at 1277, the "real possibility" language muddles the reasonable doubt standard to the point that "there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner." *People v. Garcia*, 2021 COA 80, ¶ 26, 495 P.3d 362, 369, *aff'd*, 2023 CO 30, 531 P.3d 1031.

¶ 112    Because, in my view, the use of the "real possibility" language lowered the prosecution's burden below proof beyond a reasonable doubt, I would conclude that the error is structural and Simms's felony menacing conviction must be reversed on this ground, as well. *See Johnson v. People*, 2019 CO 17, ¶ 8, 436 P.3d 529, 531. In any event, I encourage the trial court to exercise its "discretion to

depart from th[is] problematic portion[] of the pattern instruction" when Simms is retried for felony menacing. *Berumen*, ¶ 78 & n.5, 583 P.3d at 1278 & n.5 (Berger, J., concurring in part and dissenting in part). Moreover, I urge the supreme court to disapprove the "real possibility" language in the current model jury instruction. *See* COLJI-Crim. E:03 (2025). Accordingly, I concur with Parts II.B and II.C of the majority opinion, but I dissent from Part II.A.